# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3844

_____

| | | |
|---|---|---|
| Estate of Helen Christiansen, Deceased, | * | |
| Christine Christiansen Hamilton, | * | |
| Personal Representative, | * | |
| | * | |
| Petitioner-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | Tax Court. |
| | * | |
| Commissioner of Internal Revenue, | * | |
| | * | |
| Respondent-Appellant. | * | |

_____

Submitted: September 22, 2009
Filed: November 13, 2009 (Corrected: 11/18/09)

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

The Tax Court[1] held that a partial disclaimer was valid at least as to an amount that subsequently passed to a foundation that Helen Christiansen ("Christiansen") named as a contingent beneficiary in her will. The Tax Court also held that Christiansen's estate was entitled to a charitable deduction for this amount. The Commissioner of Internal Revenue appeals, and we affirm.

_____

[1]The Honorable Mark V. Holmes, United States Tax Court Judge, writing for a unanimous en banc Tax Court.

Christine Christiansen Hamilton ("Hamilton"), Christiansen's only child and executor of Christiansen's estate, disclaimed her interest in the estate "as finally determined for federal estate tax purposes" as to all amounts over $6.35 million. As relevant to this appeal, Christiansen's will provided that twenty-five percent of any disclaimed amounts were to go to a charitable foundation. The Commissioner challenged both the validity of the disclaimer and the amount reported as the estate's overall value.

The parties eventually settled regarding a substantially increased valuation for the estate based largely on adjustments to marketability discounts the estate had claimed for limited partnership interests in a family ranching enterprise. This resulted in a corresponding increase in the valuation of the contribution to the charitable foundation. The Commissioner, however, denied the estate an increased charitable deduction. The Commissioner argued that the act of challenging the estate's return and the resulting adjustment to the estate's value served as post-death, post-disclaimer contingencies that disqualified the disclaimer under 26 U.S.C. § 2518 and Treasury Regulation § 20.2055-2(b)(1). The estate appealed to the United States Tax Court and the Tax Court rejected the Commissioner's arguments.

On appeal to our court, the Commissioner presents two purely legal arguments. As to these issues, our review of the Tax Court is de novo. Blodgett v. Comm'r, 394 F.3d 1030, 1035 (8th Cir. 2005) ("[A] tax court's legal conclusions and mixed questions of law and fact are subject to de novo review."). First, the Commissioner argues that because the overall value of the estate was not finally determined at the time of Helen's death, but only after the Commissioner's partially successful challenge, the transfer to the foundation was, ultimately, "dependent upon the performance of some act or the happening of a precedent event" in violation of Treasury Regulation § 20.2055-2(b)(1). The Commissioner identifies as the purported "precedent event" or contingency the challenge mounted against the estate's initial return and the ultimate process of settling the estate's value.

As a second argument, the Commissioner asserts policy concerns related to the incentives and disincentives that exist regarding the decision to conduct audits in any given case. In particular, the Commissioner argues that we should disallow fractional disclaimers that have a practical effect of disclaiming all amounts above a fixed-dollar amount. According to the Commissioner, such disclaimers fail to preserve a financial incentive for the Commissioner to audit an estate's return. With such a disclaimer, any post-challenge adjustment to the value of an estate could consist entirely of an increased charitable donation. Because this scenario would provide no possibility of enhanced tax receipts as an incentive for the Commissioner to audit the return and ensure accurate valuation of the estate, the Commissioner argues such disclaimers should be categorically disqualified as against public policy.

Regarding the first argument, we are unable to accept the Commissioner's interpretation of Treasury Regulation § 20.2055-2(b)(1). The regulation is clear and unambiguous and it does not speak in terms of the existence or finality of an accounting valuation at the date of death or disclaimer. Rather, it speaks in terms of the existence of *a transfer* at the date of death. See Treas. Reg. § 20.2055-2(b)(1) ("If, as of the date of a decedent's death, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible."); see also 26 U.S.C. § 2518(a) (providing that a qualifying disclaimer relates back to the time of death by allowing disclaimed amounts to pass as though the initial transfer had never occurred); S.D. Codified Laws § 29A-2-801 (b) (same). Here, all that remained uncertain following the disclaimer was the valuation of the estate, and therefore, the value of the charitable donation. The foundation's right to receive twenty-five percent of those amounts in excess of $6.35 million was certain.

In pressing his current argument, the Commissioner fails to distinguish between events that occur post-death that change the actual value of an asset or estate and

events that occur post-death that are merely part of the legal or accounting process of determining value at the time of death. The Commissioner cites several cases in which courts disallowed deductions because future contingent events might have defeated a transfer or a charitable contribution. See Comm'r v. Sternberger's Estate, 348 U.S. 187, 199 (1955) (deduction disallowed where bequest to charity was dependent upon testator's daughter dying without descendants); Henslee v. Union Planters, 335 U.S. 595, 600 (1949) (deduction disallowed where a bequest to charity was the remainder of trust and where the trust's primary beneficiary had the right to invade the trust corpus, therefore making not only the value of the bequest contingent, but making the existence of the charitable bequest non-ascertainable); Bookwalter v. Lamar, 323 F.2d 664, 669–70 (8th Cir. 1963) (marital deduction disallowed where surviving spouse's continued survival was a condition upon disposition of the estate, thus creating "a 'terminable interest' within the meaning of § 2056 of the 1954 [Internal Revenue] Code."). In each cited case, however, the actual contingencies under scrutiny were outside the legal or accounting process of determining a date-of-death value for the estate or an asset. None of these cases stand for the proposition that deductions are to be disallowed if valuations involve lengthy or disputed appraisal efforts or if the Commissioner's actions in challenging a return result in determination of an adjusted value. As stated by the Tax Court below:

> That the estate and the IRS bickered about the value of the property being transferred doesn't mean the transfer itself was contingent in the sense of dependent for its existence on a future event. Resolution of a dispute about the fair market value of assets on the date Christiansen died depends only on a settlement or final adjudication of a dispute about the past, not the happening of some event in the future.

In fact, in a different subsection of the regulation, the agency itself recognizes that references to values "as finally determined for Federal estate tax purposes" are sufficiently certain to be considered "determinable" for purposes of qualifying as a guaranteed annuity interest. Treas. Reg. § 20.2055-2(e)(2)(vi)(a). In doing so, the

-4-

agency expressly uses the above-quoted language to distinguish fixed determinable amounts from fluctuating formulas that depend upon future conditions for their determination. The regulation provides:

> An amount is determinable if the exact amount which must be paid under the conditions specified in the instrument of transfer can be ascertained as of the appropriate valuation date. For example, the amount to be paid may be a stated sum for a term of years, or for the life of the decedent's spouse, at the expiration of which it may be changed by a specified amount, but *it may not be redetermined by reference to a fluctuating index such as the cost of living index.* In further illustration, the amount to be paid may be expressed in terms *of a fraction or a percentage of the net fair market value, as finally determined for Federal estate tax purposes*, of the residue of the estate on the appropriate valuation date, or it may be expressed in terms of a fraction or percentage of the cost of living index on the appropriate valuation date.

Id. (Emphasis added). It seems clear, then, that references to value "as finally determined for estate tax purposes" are not references that are dependent upon post-death contingencies that might disqualify a disclaimer. Because the only uncertainty in the present case was the calculation of value to be placed on a right to receive twenty-five percent of the estate in excess of $6.35 million, and because no post-death events outside the context of the valuation process are alleged as post-death contingencies, the disclaimer was a "qualified disclaimer." 26 U.S.C. § 2518(a). We find no support for the Commissioner's assertion that his challenge to the estate's return and the ultimate valuation process and settlement are the type of post-death events that may disqualify a partial disclaimer.

Regarding the second argument, we agree with the Commissioner that the Tax Court's ruling in this case may marginally detract from the incentive to audit estate returns. It is possible that in some hypothetical case involving a fixed-dollar-amount partial disclaimer, a post-challenge correction to an estate's value could result in a

charitable deduction equal to the increase in the estate, resulting in no increased estate tax.[2] The Commissioner argues that a policy supporting audits as a means to enforce accurate reporting requirements mandates that we disallow fixed-dollar-amount partial disclaimers because of the potential moral hazard or untoward incentive they create for executors and administrators to undervalue estates.

For several reasons, we disagree with the Commissioner's argument that we must interpret the statute and regulations in an effort to maximize the incentive to audit. First, we note that the Commissioner's role is not merely to maximize tax receipts and conduct litigation based on a calculus as to which cases will result in the greatest collection. Rather, the Commissioner's role is to enforce the tax laws. See 26 U.S.C. § 7801 (a)(1) ("[T]he administration and enforcement of [the Tax Code] shall be performed by or under the supervision of the Secretary of the Treasury."); id. § 7803(a)(2) ("The Commissioner shall have such duties and powers as the Secretary may prescribe, including the power to (A) administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions to which the United States is a party . . . .").

Second, we find no evidence of a clear Congressional intent suggesting a policy to maximize incentives for the Commissioner to challenge or audit returns. The

---

[2]As a practical matter, that is not the case with Christiansen's estate. Christiansen's will provided that in the event of a disclaimer, 75% of the disclaimed amount would go to a charitable lead annuity trust and 25% would go the foundation. The Commissioner found the disclaimer invalid for other reasons as to the 75% passing to the charitable lead annuity trust, and the estate does not appeal as to that amount. Accordingly, the present case involves only 25% of the amount that Hamilton initially attempted to disclaim. As a result, for every dollar of increase in the finally determined value of the estate, the estate, in fact, seeks only a $0.25 charitable deduction. In other words, although we reject the Commissioner's policy-based argument as a matter of law, those arguments are not entirely applicable to the present, undisputed facts.

relevant policy in the present context is clear, and it is a policy more general in nature than that articulated by the Commissioner: Congress sought to encourage charitable donations by allowing deductions for such donations.  See 26 U.S.C. § 2055(a)(2); Sternberger's Estate, 348 U.S. at 190 n.3 ("The purpose of the deduction is to encourage gifts to the named uses.").  Allowing fixed-dollar-amount partial disclaimers supports this broad policy.

Third, and importantly, even if we were to find a general congressional intent regarding a need to maximize the incentive-to-audit, no corresponding rule of construction would be necessary in the present context to promote accurate reporting of estate values.  The Commissioner premises his policy argument on the assumption that executors and administrators will purposefully undervalue assets in order to take advantage of his marginally decreased incentive to audit.  In the present context, however, there are countless other mechanisms in place to ensure that fiduciaries such as executors and administrators accurately report estate values.  State laws impose personal liability on fiduciaries, and state and federal laws impose financial liability or, in some circumstances criminal sanctions, upon false statements, fraud, and knowing misrepresentations.  See, e.g., S.D. Codified Laws § 29A-3-703(a) ("A personal representative is a fiduciary . . . ."); id. § 55-9-5 (providing that the attorney general is the representative of beneficiaries of charitable foundations and has a duty to enforce their rights in court actions); 18 U.S.C. 1001 et seq. (criminalizing various acts of fraud and knowing misrepresentations); Ward v. Lange, 553 N.W.2d 246, 250 (S.D. 1996) ("[T]he fiduciary has a 'duty to act primarily for the benefit' of the other.") (quoting High Plains Genetics Research, Inc. v. J K Mill-Iron Ranch, 535 N.W.2d 839, 842 (S.D. 1995)).

In addition, with a fixed-dollar-amount partial disclaimer, the contingent beneficiaries taking the disclaimed property have an interest in ensuring that the executor or administrator does not under-report the estate's value.  Such beneficiaries,

therefore, have an interest in serving a watchdog function.[3]  Further, in this case Hamilton was not only the primary beneficiary who made the contested partial disclaimer, she was the executor of the estate and a board member for the foundation. Because she owed a fiduciary obligation to both the estate and the foundation, any self-dealing in this instance would be a clear violation of her general state-law fiduciary obligation to put the interests of the foundation above her own interests and possibly a violation of state and federal statutory prohibitions on certain forms of self dealing.  See Ward, 553 N.W.2d at 250; S.D. Codified Laws § 55-9-8 ("The trustee of a trust described in § 55-9-7 shall not engage in any act of self-dealing which would give rise to any liability for the tax imposed by section 4941 (a) of the Internal Revenue Code."); id. § 55-9-7 (defining trusts to include private foundations).  In general, and on the specific facts of the present case, then, there are sufficient mechanisms in place to promote and police the accurate reporting of estate values beyond just the threat of audit by the Commissioner, thereby undercutting the Commissioner's policy-based argument.

We affirm the judgment of the Tax Court.

_____

[3]The parties have not briefed, and we do not address the question of whether such beneficiaries have standing to intervene in tax disputes between the Commissioner and an estate.  We note simply that in the context of disclaimers of the type at issue in this case, the Commissioner's interest in ensuring accurate reporting of estate values is aligned with the interests of the contingent beneficiaries.