T.C. Memo. 2009-280

UNITED STATES TAX COURT

ESTATE OF ANNE Y. PETTER, DECEASED, TERRENCE D. PETTER, PERSONAL
REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket No. 25950-06.                    Filed December 7, 2009.

John W. Porter, Keri D. Brown, Stephanie Loomis Price, and
J. Graham Kenney, for petitioner.

Randall E. Heath and Sandra Veliz, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Anne Petter inherited a large amount of

valuable stock and set up a company to hold it.[1]  She divided

---

[1] Anne died after trial, so references to her are references
                                                  (continued...)

ownership of the company among herself, trusts for her children's benefit, and charities. She performed this division by allocating a fixed number of units in the company to herself, a fixed dollar amount to the trusts, and the rest to the charities.

Her estate and the Commissioner now agree that the value of the company was higher than she first reported. That has triggered the obligation to reallocate more shares in the company to the charities. The question is how to measure the size of the gift on which tax is owed: We have to multiply the new value of the shares by the number of shares going to the charities, but is it the number of shares before or after the reallocation?

FINDINGS OF FACT

Anne Petter's uncle was one of the first investors in what became United Parcel Service of America, Inc. (UPS). UPS was a privately owned company for most of its existence, and its stock was mostly passed within the families of its employees. When Anne's uncle died in 1982, he left her his stock. It was by then worth millions.

Anne had been a schoolteacher most of her life, and after her windfall, she continued to teach in Washington State, where she resided almost all her life--including when she filed the petition in this case. She also stayed in the same house. And

_____

[1](...continued)
to her estate and her son as its personal representative.

she continued to stay close to her children. She had three--
Donna Petter Moreland, Terrence Petter (Terry), and David Petter.
Donna has little or no business experience, and worked mostly
inside the home, rearing three young children. Terry owns a tow
truck business, and has three adult children of his own.[2]

These children and grandchildren were the natural objects of
Anne's affection, and by 1998 she realized that her UPS stock put
her in need of an estate planner. She first went to her lawyer,
Jim Tannesen, for advice. But when she told him that she thought
her estate would be worth close to $12 million, Tannesen had the
professional responsibility to suggest a lawyer more experienced
in handling high-value estates. He referred Anne to Richard
LeMaster, a lawyer with 30 years of estate-planning experience
and advanced degrees in tax law.

I. Future Planning

LeMaster first asked Anne what she wanted to do with her
wealth. She told him that she wanted her estate put "in order"
so it could provide a comfortable life for her children and their
children, and that she wanted to give some money to charity.
Anne also wanted Donna and Terry to learn how to manage the
family's assets, but she felt they needed help to learn how to
invest and manage money wisely.

_____

[2] This case does not involve David, who is disabled. Anne
provided separately for him, and those transfers are not at
issue.

LeMaster set to work.  First, he created a life insurance trust (ILIT) in 1998 to cover any estate taxes.[3]  Anne contributed enough to the ILIT in September 1998 for it to buy a $3.5-million life-insurance policy, with her children and grandchildren as beneficiaries.  The purpose of the ILIT was to create a source of ready cash to pay the large estate tax bill that would arise upon Anne's death.  LeMaster couldn't just put the money in a bank account in Anne's name; doing that would make Anne the owner of the money, and it would become yet another taxable part of the estate.  Instead, he made the trust the owner and Anne's heirs the beneficiaries, excluding it from the estate.

LeMaster then put $4 million of UPS stock in a charitable remainder unitrust (CRUT) to cover Anne's day-to-day expenses for the rest of her life.[4]  The CRUT gave Anne an annual income of 5

---

[3] Anne set up an irrevocable life insurance trust instead of simply buying a life insurance policy and naming beneficiaries, which may have estate or gift tax consequences.  The ILIT buys a life insurance policy on the life of the grantor, and the ILIT then names the beneficiaries.  This structure removes the insurance policy from the grantor's estate and can allow the proceeds to flow to the beneficiaries tax free.

[4] CRUTs are governed by section 664.  They must pay a specified percentage of their fair market value to a beneficiary at least annually, followed by payment of the remaining trust corpus to a charity.  If a CRUT meets all the regulatory requirements, the taxpayer may take a charitable deduction equal to the value of the charitable remainder in the year he creates the trust.  Sec. 1.170A-6(b)(1)(iii), Income Tax Regs.  (Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.)

percent of its assets--dividends being sufficient to fund the payout without generating immediate capital gains tax.  After she died, the remainder passed to charity.

II.  The Petter Family Limited Liability Company and the Trusts

At the heart of the plan, and the center of this case, were the Petter Family LLC (PFLLC) and the trusts.  LeMaster designed the PFLLC in 1998 to be a disregarded limited liability company[5] incorporated in Washington.  He planned to fund it with UPS stock at a later date, but then in November 1999 UPS announced it was going public.  This froze Anne's UPS stock so she could not transfer it until the initial public offering was done.[6]  After Anne's stock thawed out in May 2001, she discovered that its value had risen to $22.6 million.

---

[5] A limited liability company, unless it elects to be taxed as a corporation, is a passthrough entity; its profits and losses "pass through" the entity to the owners, called members, who pay individual income tax.  An LLC's owners do not own shares, but membership "units".  An LLC with just one owner is "disregarded" if it is recognized under state law (for instance, to limit the owner's liability) but ignored under federal tax law, so that the taxable activities of the company are treated as though the owner carried out those activities himself.  Sec. 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

[6] Companies often impose "lock-up" periods when they make an initial public offering to prevent existing shareholders from immediately selling their stock.  In theory this prevents a flood of stock from hitting the market and lowering its price near the start of public trading.  See McIntyre, "IPO Lock-Ups Stop Insider Selling," Investopedia, http://investopedia.com/articles/stocks/07/ipo_lockup.asp?#.

LeMaster and Anne began finishing their plans for the PFLLC. LeMaster had drawn up the "Petter Family LLC Operating Agreement," which Anne, Donna, and Terry signed.  Anne contributed 423,136 shares of UPS stock worth $22,633,545 to the PFLLC.  These shares formed Anne's capital account, defined in the Operating Agreement as an "account which will initially reflect the Member's interest in the property contributed upon formation of the Company net of associated liabilities."  She received 22,633,545 membership units, divided into three classes monogrammed with the initials of herself and her children: Class A, Class D, and Class T.[7]

| Membership Unit Class | Number of Units |
| --- | --- |
| Class A | 452,671 |
| Class D | 11,090,437 |
| Class T | 11,090,437 |
| Total | 22,633,545 |

The holders of each class of units had the right to elect a manager by majority vote.  Anne became the manager of the Class A units, Donna managed Class D, and Terry managed Class T.  A majority of the managers had to approve decisions about how to manage the company, with the caveat that no vote could pass

---

[7] Although the Operating Agreement for the PFLLC says the initial capital account for each member is $1,000 per unit, we find that Anne's capital account was actually $1 per unit, as she gave UPS stock worth $22,633,545 and got 22,633,545 units in return.  The discrepancy is immaterial to our holding.

without the approval of the manager in charge of the Class A units--effectively giving Anne veto power over all corporate decisionmaking. Another potentially important provision required that when members (rather than managers) voted, the vote carried by a majority of membership units for each class, not just a majority of members. This meant, for instance, that if members outside the family acquired a majority of any class of shares, they could override the family's votes and elect their own manager.

But the Operating Agreement also made such a loss of control unlikely: It restricted what rights could be transferred by gift or bequest so that transfers outside the Petter family required manager approval, and transferees took only "Assignees' Rights" unless they were accepted as a "Substituted Member" by the managers. Assignees had no voting rights but got distributions of profits and losses. LeMaster advised Anne that managers owed fiduciary duties to all members, but owed no such duties to assignees. Substituted members had to pay transfer costs and become parties to the Operating Agreement by executing instruments of joinder.

This was undoubtedly the most complex transaction any of the Petters had been a part of. Donna struggled to understand it and even hired an attorney to help her. That lawyer seems to have been of some help--LeMaster refers to some changes in the trust

structure that Donna's lawyer prompted him to make--but the record does not show specifically what they were. The situation does not seem to have turned at all adversarial, however, and Donna did not even remember any specific bits of advice her lawyer gave.

Once Anne had all the units in place and divided into classes, it was time to transfer them to Donna and Terry. In late 2001, LeMaster set up two intentionally defective grantor trusts. (Although specialists call them "defective," these types of trusts are widely used by sophisticated estate planners for honest purposes.) Anne's trusts were defective because they allowed the trustee of either trust to purchase and pay premiums on a life insurance policy on the life of the grantor (Anne), in contravention of section 677(a)(3). This meant that for income-tax purposes--though not for any other purpose--Anne would be treated as the owner of the assets even though they were legally owned by a trustee, and she herself would remain liable for income taxes on the trust's income for the rest of her life. This arrangement did, however, remove those assets held in trust from Anne's estate, reducing her estate-tax liability. It also allowed her to make income-tax payments for the trusts without the IRS' treating those payments as additional gifts to her children. Donna became the trustee of the Donna K. Moreland 2001 Long Term Trust (Donna's trust), and Terry became the trustee of

the Terrence F. Petter 2001 Long Term Trust (Terry's trust).
Donna's trust named Donna and her descendants as beneficiaries;
Terry's named him and his descendants as beneficiaries.

III. Funding the Trusts

The transfer proceeded in two parts--first a gift, then a
sale.  On March 22, 2002, Anne gave the trusts PFLLC units meant
to make up 10 percent of the trusts' assets; then on March 25 she
sold them units worth 90 percent of the trusts' assets in return
for promissory notes.[8]

As part of these transfers, Anne also gave units to two
charities--the Seattle Foundation and the Kitsap Community
Foundation.  Both are public charities under section 501(c)(3),
which means donors can deduct donations worth up to 50 percent of
their income.  (This is an advantage that public charities have
over private foundations, whose donors can deduct contributions
only up to the lesser of 30 percent of income or what's left of
their 50 percent public-charity balance.  Sec. 170(b)(1)(A)(vii),
(B), (F).)  Anne chose charities that are community foundations
offering "donor-advised funds."  Donor-advised funds are owned
and controlled by a charity, but kept separately identified.
Donors can at their leisure later advise the charity where they

---

[8] LeMaster said he believed there was a rule of thumb that a
trust capitalized with a gift at least 10 percent of its assets
would be viewed by the IRS as a legitimate, arm's-length
purchaser in the later sale.

want the money to go and how it should be invested.  See sec. 4966(d)(2)(A).  Community foundations accept contributions, manage investments, and then spread the money across a wide variety of charitable organizations, easing the administrative burdens of charitable giving.[9]  The Seattle Foundation is big enough that it has the expertise to handle large and complex gifts like Anne's, which would have been too complicated for many of the smaller charities that were the ultimate recipients of her largesse.

The division of PFLLC's units among gifts to the trusts and community foundations, and gifts and sales to the trusts, meant that Anne had to value what she was giving and selling.  LeMaster used a formula clause dividing the units between the trusts and two charities, to ensure that the trusts did not get so much that Anne would have to pay gift tax.  There were two sets of gift documents, one for Donna's trust which named it and the Kitsap Community Foundation as transferees; and a similar set for Terry's trust which named it and the Seattle Foundation as transferees.  The formula is laid out in both sets and in several sections.  Recital C of Terry's document, for example, provides

---

[9] Although community foundations tend to be rather quiet in their fund-raising, they are rapidly becoming a force in charitable giving across the country, increasing dollars donated from half a billion in 1990 to an estimated $4.6 billion in 2008. Key Facts on Community Foundations, 2 (Foundation Center, May 2009).

"Transferor wishes to assign 940 Class T Membership Units in the Company (the "Units") including all of the Transferor's right, title and interest in the economic, management and voting rights in the Units as a gift to the Transferees."  Donna's document is similar, except that it conveys Class D membership units.

Section 1.1 of Terry's transfer document reads:

> Transferor * * *
> 1.1.1      assigns to the Trust as a gift the number of Units described in Recital C above that equals one-half the minimum[10] dollar amount that can pass free of federal gift tax by reason of Transferor's applicable exclusion amount allowed by Code Section 2010(c).  Transferor currently understands her unused applicable exclusion amount to be $907,820, so that the amount of this gift should be $453,910; and
>
> 1.1.2      assigns to The Seattle Foundation as a gift to the A.Y. Petter Family Advised Fund of The Seattle Foundation the difference between the total number of Units described in Recital C above and the number of Units assigned to the Trust in Section 1.1.1.

The gift documents also provide in section 1.2:

> The Trust agrees that, if the value of the Units it initially receives is finally determined for federal gift tax purposes to exceed the amount described in Section 1.1.1, Trustee will, on behalf of the Trust and as a condition of the gift to it, transfer the excess Units to The Seattle Foundation as soon as practicable.

---

[10] This is a typo.  The intention of all the parties involved was to refer to the *maximum* amount that could pass free of gift tax.  The Commissioner did not raise any problems that this language might cause, and we find it to have been a mere scrivener's error.

The Foundations similarly agree to return excess units to the trust if the value of the units is "finally determined for federal gift tax purposes" to be less than the amount described in section 1.1.1.  Donna's documents are similar but substitute the Kitsap Community Foundation for the Seattle Foundation.

For the March 25, 2002 sale, both trusts split their shares with the Seattle Foundation.  Recital C of the sale documents reads:  "Transferor wishes to assign 8,459 Class T [or Class D] Membership Units in the Company (the "Units") including all of the Transferor's right, title and interest in the economic, management and voting rights in the Units by sale to the Trust and as a gift to The Seattle Foundation."  Section 1.1 reads:

> Transferor * * *
> 1.1.1      assigns and sells to the Trust the number of Units described in Recital C above that equals a value of $4,085,190 as finally determined for federal gift tax purposes; and
>
> 1.1.2      assigns to The Seattle Foundation as a gift to the A.Y. Petter Family Advised Fund of The Seattle Foundation the difference between the total number of Units described in Recital C above and the number of Units assigned and sold to the Trust in Section 1.1.1.

Section 1.2 of the sale documents differs slightly from section 1.2 of the gift documents.  In the sale documents, it reads: "The Trust agrees that, if the value of the Units it receives is finally determined to exceed $4,085,190, Trustee will, on behalf of the Trust and as a condition of the sale to it, transfer the

excess Units to The Seattle Foundation as soon as practicable."[11] Likewise, the Seattle Foundation agrees to transfer shares to the trust if the value is found to be lower than $4,085,190.

In exchange for the units transferred in the sale documents, Donna and Terry, as trustees for their trusts, each executed $4,085,190 installment notes on March 25, 2002.  The notes have a 5.37-percent interest rate and require quarterly payments of $83,476.30 for principal and accrued interest.  The notes have a 20-year term, expiring on March 25, 2022.  Anne and the children as trustees signed pledge agreements giving Anne a security interest in the PFLLC shares transferred under the sale agreements.  The pledge agreements specify:

> It is the understanding of the Pledgor and the Security Party [sic] that the fair market value of the Pledged Units is equal to the amount of the loan--i.e., $4,085,190.  If this net fair market value has been incorrectly determined, then within a reasonable period after the fair market value is finally determined for federal gift tax purposes, the number of Pledged Units will be adjusted so as to equal the value of the loan as so determined.

The parties agree that Donna's and Terry's trusts have made regular quarterly payments since July 2002.  The trusts were able to make payments because the PFLLC paid quarterly distributions to all members, crafted so the amounts paid to the trusts covered their quarterly payment obligations.

---

[11] Donna's sale documents also add "initially" before "receives" in section 1.2.

The transfer documents clearly indicate that Anne intended Donna, Terry, and the two Foundations to be substituted members, rather than assignees; section 3 of each transfer document reads, "Upon each Transferee's execution of this Transfer Agreement, it will be admitted as a Substituted Member under the terms and subject to the requirements and limitations of the Operating Agreement."

Both the gift documents and the sale documents have two signature pages. The first bears the signatures of Anne (as transferor), Donna or Terry as trustee of their trusts, and the president of the Seattle or Kitsap Community Foundation. The second set is the "Consent of Managers and Members." For the gift documents, Anne, Donna, and Terry each signed as both managers and members. For the sale documents, Anne, Donna, and Terry signed as consenting managers and members, but the Kitsap Community Foundation president also signed as a consenting member.

## IV. The Charities

We have no doubt that behind these complex transactions lay Anne's simple intent to pass on as much as she could to her children and grandchildren without having to pay gift tax, and to give the rest to charities in her community. LeMaster got the community foundations involved because he knew Bill Sperling, who was involved in gift planning at the Seattle Foundation, and it

was this relationship that led to LeMaster's suggestion to the Petters that they create a donor-advised fund.

Donna decided that she wanted to donate to the Kitsap Community Foundation because she lived in Kitsap County and wanted to make a bigger difference in a smaller community.[12] She also trusted the smaller organization because her father-in-law was familiar with it, and her lawyer was on its board of directors. The Kitsap Community Foundation was tiny compared to the Seattle Foundation and did not have the expertise to independently vet the paperwork, so it glommed onto the same agreements the Petters negotiated with the Seattle Foundation.

Because the Petter gift consisted of units in the PFLLC, rather than liquid equities or cash, the Seattle Foundation asked outside counsel to evaluate whether accepting the units would jeopardize the tax-exempt status of the donor-advised fund. Michele Osborne, a lawyer at Davis Wright Tremaine LLP, negotiated the terms of the transfer for the Seattle Foundation and, as a practical matter, for the Kitsap Community Foundation too. She asked that the transfer documents make clear that the Foundations would bear no legal costs in connection with the gift. She also wanted to clarify that the Foundations would be

_____

[12] Donna was right about being able to make a difference--in 2004 her donations of $30,000 more than doubled the Foundation's total annual grantmaking. In contrast, the Seattle Foundation held more than $600 million worth of assets.

substituted members in the PFLLC, rather than assignees with no voting rights.  Osborne also recognized that the Foundations might need distributions from the PFLLC to cover any taxes triggered by the transaction and warned the Petters that they would have to monitor the investment mix of the PFLLC to ensure that the Seattle Foundation did not become exposed to unrelated business taxable income.[13]  She suggested some specific changes to the transfer documents to address her concerns, and LeMaster accepted them.

On the date of the gifts and sales to the trusts, Anne sent letters to the foundations describing her gift.  In them she requested that the foundations establish A.Y. Petter Family Advised Funds funded by "that portion of a gift of 940 Class D [or Class T] Membership Units (the "LLC Units") in Petter Family L.L.C. that exceeds a value of $453,910 as of the closing of the New York Stock Exchange on that date."  In similar letters describing the units that she was selling to the trusts, she made a point of describing her additional gift to the Foundations of "that portion of a transfer of 8,459 Class D [or Class T] Membership Units (the "LLC Units") in Petter Family L.L.C. that exceeds a value of $4,085,190 at 12:01 am on March 25, 2002."

---

[13] Tax-exempt organizations have to pay taxes on income if the income comes from a trade or business that is unrelated to the organization's charitable purpose.  Secs. 511 through 513.

Once the transfers were completed, the Petters directed many gifts through both the Foundations to such organizations as the Downtown Action to Save Housing, the Real Change Homeless Empowerment Project, the Girl Scouts, Junior Achievement, the Olympic Music Festival, the Kitsap Children's Musical Theatre, the Salvation Army, Habitat for Humanity, local food pantries, and many others.

V.    Appraisal, Unit Distribution, and Audit

During the planning stages, LeMaster had to estimate the value of the PFLLC units so he could predict how many units might go to the trusts and how many might go to the Foundations.  His method was not sophisticated:  He took the market value of the UPS stock held by the PFLLC, and discounted it by 40 percent. Such a discount is a major goal, and often a major problem, of contemporary estate planning.  Anne could of course have just transferred and sold her UPS stock outright.  But doing so would've enabled the Commissioner to tax her on its full value-- UPS stock is publicly traded and easy to price.  But a gift of membership units in an LLC is harder to value because provisions in the operating agreement restrict members' rights to sell, and typically no single member is allowed to sell LLC assets without approval of the managers.  This creates the possibility of a more taxpayer-friendly valuation.  See Estate of Erickson v.

Commissioner, T.C. Memo. 2007-107 (acknowledging the valuation benefits associated with family limited partnerships).

But once the documents were signed and the deal was done, LeMaster's estimates needed to be replaced with a formal appraisal. He turned to the well-known firm of Moss Adams. On April 15, 2002, Moss Adams sent LeMaster the 41-page "Petter Family LLC Appraisal Report," valuing the membership units as of the March 22 gift to the trusts. Moss Adams's appraisal compared the PFLLC to closed-end mutual funds owning domestic stock and having little or no debt. Closed-end funds very often trade at a discount to net-asset value, and Moss Adams's survey of the range of those discounts led it to take a valuation discount of 13.3 percent,[14] to value the PFLLC at $22.5 million. From there it lopped off an additional 46 percent for nonmarketability, reached by averaging the marketability discounts found in two studies. The result was a unit value of $536.20.

On the basis of the Moss Adams valuation, LeMaster allocated the shares transferred by Anne's gift and sale:

---

[14] Moss Adams determined a general market discount of 3.7 percent for closed-end funds and added 9.6 percent to the discount rate to account for the PFLLC's "unique risk factors." (The 9.6 percent represented 10 percent of the PFLLC's discounted value.) Unique risk factors were those for which, according to Moss Adams, the PFLLC had more risk than the companies in the market study--notably lack of asset diversification.

| Recipient | Class of Unit | Number of Units |
|---|---|---|
| Terry's trust | T | 8,465.31 |
| Donna's trust | D | 8,465.31 |
| Seattle Foundation | T | 933.689 |
| Seattle Foundation | D | 840.22 |
| Kitsap Community Foundation | D | 93.469 |

Anne kept the rest:

| Class of Units | Number of Units |
|---|---|
| Class A | 452.671 |
| Class T | 1,691.44 |
| Class D | 1,691.44 |
| Total | 3,835.551 |

This left the parties with the following interests in the PFLLC:

| Name | Total Number of Units Owned | Percent Interest |
|---|---|---|
| Anne | 3,835.551 | 16.9463% |
| Terry's trust | 8,465.311 | 37.4016 |
| Donna's trust | 8,465.311 | 37.4016 |
| Seattle Foundation | 1,773.909 | 7.8375 |
| Kitsap Community Foundation | 93.469 | 0.413 |

Although Anne now had a much smaller interest than either of the trusts, she owned all the class A shares, entitling her to elect a manager with veto power over any other managers.  And the Foundations both had minority interests, allowing Terry's and Donna's trusts to retain control over votes for the managers of the Class T and D units.

Anne timely filed a gift tax return in August 2003.  She hid nothing:  On that return, she listed gifts worth $453,910 to Donna's and Terry's trusts; gifts worth $50,128, $450,618, and $450,618 to the Seattle Foundation; and a gift worth $50,128 to the Kitsap Community Foundation.  For all of these gifts, her return indicated that the gifts were units in the PFLLC and "the value of the limited liability company is based on the fair market value of the underlying assets with a 46% non-marketability discount and a 13.3% net asset value adjustment applied."  She also listed several cash gifts of $11,000 or less to her children, grandchildren, and son-in-law.

She even attached to the return a disclosure statement that included the formula clauses from the transfer documents, a spreadsheet of the PFLLC unit allocation, the organizing documents for the PFLLC, the trust agreements and transfer documents, letters of intent to the Seattle Foundation and the Kitsap Community Foundation, the Moss Adams appraisal report, annual statements of account for her UPS stock, and Forms 8283,

Noncash Charitable Contributions, disclosing her gifts to the Seattle Foundation and the Kitsap Community Foundation.

The Commissioner's audit began in January 2005. The parties agree that throughout the audit Anne "complied with every request for witnesses, information, documents, meetings or interviews" in a timely manner. The parties were unable to resolve the issues during the examination, and in November 2006 the Commissioner sent Anne a notice of deficiency in gift tax for 2002.

The Commissioner had several quarrels. First, he believed the correct value of a single class T or D membership unit in the PFLLC was much higher than reported. He thought it should be $794.39, which would balloon the total value held by the trusts and the charities:

| Owner | Number of Units | Moss Adams Value | IRS Value |
|---|---|---|---|
| Terry's trust | 8,465.311 | $4,539,099.22 | $6,724,758.41 |
| Donna's trust | 8,465.311 | 4,539,099.22 | 6,724,758.41 |
| Seattle Foundation | 1,773.909 | 951,170.01 | 1,409,175.57 |
| Kitsap Community Foundation | 93.469 | 50,118.08 | 74,250.84 |

LeMaster had anticipated that the final unit value might be different from his or Moss Adams's, and thought he had accounted for it with all the formula clauses we've already described. Under these clauses, a revaluation would trigger a reallocation

of shares from the trusts to the charities, creating--LeMaster thought--a greater charitable deduction for Anne but no additional gift tax.  The Commissioner thinks these formula clauses are invalid.  If he is right, the units might still be reallocated to the charities, but Anne would not get an additional charitable deduction.[15]  This also would mean that the shares sold to the trusts were sold for "less than full and adequate consideration," and thus were transferred partly by sale and partly by an additional $1,967,128 gift to each trust, computed by deducting the price of the installment notes from the fair market value of the shares transferred.  The Commissioner thus concluded that Anne had made gifts in the following amounts to the two trusts:

---

[15] The Commissioner did allow an additional $481,890 deduction for the increased value of the shares already given to the foundations.  There appears to be a misplaced decimal in the notice of deficiency (under "Explanation of Adjustments," Issue 1, Class D Units, March 25 Gifts).  The Commissioner correctly calculates the additional deduction under issue 2, however, so the typo does not affect our holding.

| Transaction | Original Gift | Adjusted Gift | Difference |
|---|---|---|---|
| Gift to Terry's trust | $453,910 | $672,462 | $218,552 |
| Sale to Terry's trust | -0- | 1,967,128 | 1,967,128 |
| Gift to Donna's trust | 453,910 | 672,462 | 218,552 |
| Sale to Donna's trust | -0- | 1,967,128 | 1,967,128 |
| Total taxable gift | 907,820 | 5,279,180 | 4,371,360 |

Anne filed a timely petition with us, and the parties agreed on a final valuation of $744.74 per PFLLC unit.  After reallocation at this value, the units will come to rest, with the Seattle Foundation owning the largest overall percentage (although not a majority of any single class):

| Name | Total Units Owned | Percent Interest |
|---|---|---|
| Anne | 3,835.551 | 16.946% |
| Terry's trust | 6,094.879 | 26.929 |
| Donna's trust | 6,094.879 | 26.929 |
| Seattle Foundation | 6,277.730 | 27.736 |
| Kitsap Community Foundation | 330.512 | 1.460 |

We are asked to decide whether to honor the formula clause for the gift and the sale; if we honor them, we must also decide when Anne may take the charitable contribution deduction associated with the additional units going to the Foundations.

OPINION

Anne immediately takes the defensive, denying that the clauses are void because of public policy.  She points to state law, saying that this clause works under Washington property laws to pass a particular dollar value of money to intended beneficiaries.  Because it works under state law, she says, it should also be honored under Federal gift tax law as a transfer in 2002.

The Commissioner opens fire, saying that the formula clauses are void because they are contrary to public policy, which would create an increased gift tax liability for Anne.[16]

This is an old argument.  But before launching into our analysis, we begin with some background on the gift tax.  Section 2501(a)(1) lays the groundwork for a tax "imposed for each calendar year on the transfer of property by gift during such calendar year by any individual, resident or nonresident."  Section 2502(c) tells us the donor pays the tax, not the donee.  Section 2502 explains the cumulative aspects of gift tax, whereby the tax rate for a gift is set by looking at that year's gifts in relation to the donor's lifetime giving.  Gifts of $10,000 per

---

[16] In the midst of this back-and-forth is an argument about who should bear the burden of proof under section 7491.  The issues in this case, however, are mostly a matter of applying law to uncontested facts, so we don't have to address who bears the burden of proof.  See Estate of Christiansen v. Commissioner, 130 T.C. 1, 8 n.7 (2008), affd. ___ F.3d___(8th Cir., Nov. 13, 2009).

donee per year, increased for inflation, are excluded from the lifetime cumulative total. Sec. 2503(b). Gifts for educational or medical expenses are also excluded. Sec. 2503(e).

Perhaps the most important section for our purposes, however, is section 2505, the unified credit against gift tax. In 2002, the year Anne made her gifts, the unified credit allowed a donor to make lifetime tax-free gifts of up to $1 million. At the time she made the gifts, Anne believed she had $907,820 remaining of her unified credit; and the Commissioner nowhere disputes this.

I.   Savings Clauses: Procter and Its Progeny

The parties' argument in this case harks back to the old case of Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944), revg. a Memorandum Opinion of this Court. Procter assigned remainder interests in two trusts to a new trust for the benefit of his children. After his death the assets would go to his children if he outlived his mother and, for one of the trusts, if he was at least 40 when she died. The new trust would also repay a note to Procter's mother at her death if he was still alive. The trust document had a clause adjusting the gift:

> [I]t is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of [the taxpayer].

Id. at 827. The Fourth Circuit's opinion in the case became the cornerstone of a body of law regarding "savings clauses"—adjustment clauses requiring that any gift subject to gift tax revert back to the donor.[17]

The Fourth Circuit's opinion rested on two propositions that now frequently appear in gift and estate tax cases involving adjustment clauses. The first is that the gift was a "present gift of a future interest in property" and that the formula therefore created a condition subsequent. Id. The second proposition was that the clause was "contrary to public policy" for three reasons:

- The clause had a "tendency to discourage the collection of the tax," since efforts to collect would simply undo the gift;

- The effect of the clause would be to "obstruct the administration of justice by requiring the courts to pass upon a moot case;" and

- A judicial proclamation on the value of the trust would be a declaratory judgment, because "the condition is not to become operative until there has been a judgment; but after the judgment has been rendered it cannot become operative because the matter involved is concluded by the judgment."

Id. at 827-28.

---

[17] In Christiansen, 130 T.C. at 5, the daughter specified that if her disclaimer failed to be a "qualified disclaimer," she would take all steps necessary to make it a qualified disclaimer. We called this a savings clause, but it is clearly not the same kind of adjustment clause at issue in this case.

The issue came up again when another taxpayer tried to use a similar clause, this time in a sale. This adjustment clause read: "'If the fair market value of The Colorado Corporation stock * * * is ever determined by the Internal Revenue Service to be greater or less than the fair market value determined * * * above, the purchase price shall be adjusted to the fair market value determined by the Internal Revenue Service.'" King v. United States, 545 F.2d 700, 703-04 (10th Cir. 1976). The Tenth Circuit found this clause, called a "price-adjustment clause" because it adjusts the consideration paid in a sale, to be valid. The Tenth Circuit based its decision on factual determinations that the stock was difficult to value and the sale occurred in the ordinary course of business with no donative intent. Id. at 705.

The Tenth Circuit was on its own for a long time, however; between 1976 and 2006, courts refused to honor either savings clauses or price-adjustment clauses. Knight v. Commissioner, 115 T.C. 506, 515 & n.4, 516 (2000) (giving no effect to transfer of FLP shares "equal in value" to $600,000 to trusts, when taxpayers instead reported on tax returns gift of 22.3-percent interest in FLP and argued at trial that true value of shares was lower than that reported in the transfer documents); Ward v. Commissioner, 87 T.C. 78 (1986) (relying on public-policy arguments from Procter, giving no effect to clause requiring donors to adjust

number of shares so total value is $50,000); <u>Harwood v. Commissioner</u>, 82 T.C. 239 (1984) (giving no effect to clause requiring adjustment if "in the opinion of the Attorney for the trustee a lower value is not reasonably defendable"), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). Even the Commissioner weighed in, releasing Revenue Ruling 86-41, 1986-1 C.B. 300, which found no difference between a savings clause like the one in <u>Procter</u> and the price-adjustment clause like the one in <u>King</u> that required the donee to pay the donor an amount equal to the excess value transferred as a gift. The Commissioner determined that both types of clause were invalid and would be ignored during audits.

## II.  Formula Clauses

Creative tax planners found more sophisticated ways to accommodate uncertain valuations in wealth transfers. In 2003, we decided a case in which transfer documents specified that the children of the taxpayer should receive a gift having a "fair market value" of $6,910,933; anything in excess of that up to $134,000 would go to a local symphony, and all the rest would go the Communities Foundation of Texas, Inc. <u>McCord v. Commissioner</u>, 120 T.C. 358, 364 (2003), revd. 461 F.3d 614 (5th Cir. 2006). Much like Anne's gift the taxpayer's gift was of shares in a limited liability partnership. <u>Id.</u> at 361. The donees allocated the shares amongst themselves, and they applied

a large discount.  Id. at 365-66.  Unlike the PFLLC, however, the partnership retained the rights to buy out the charitable interests; once the charities had been cashed out, the partnership no longer owed the charities fiduciary duties and the charities lost their rights to demand a reallocation.  Id. at 363-64, 366.  In a divided opinion, we found that the value of the gift was higher than the original appraisal.  Id. at 395.  We also held that the formula did not reallocate the shares later, but worked only to allocate shares on the basis of the parties' estimate of their value at the time of the gift rather than later on.  Id. at 396-97.  We did not find it necessary to consider Procter.

The Fifth Circuit reversed because, it held, we had impermissibly looked at events occurring after the sale date. McCord v. Commissioner, 461 F.3d at 626.  The Court pointed to our reliance on a later agreement between McCord's children and the charities that translated the dollar formula in the transfer documents into percentage interests in the partnership, when we should have relied only on the initial transfer documents.  Id. The Fifth Circuit also noted with approval Judge Foley's finding in his dissent that the Commissioner had not met his burden of proof.  Id. at 626.  (The Commissioner had dropped the Procter-like arguments on appeal.  Id. at 623.)

We have since looked at adjustment clauses in <u>Estate of Christiansen v. Commissioner</u>, affd. ___ F.3d ___ (8th Cir., Nov. 13, 2009). There, the taxpayer's daughter structured a disclaimer of her inheritance to keep part of it and give the rest to charity. The formula was quite complicated:

> Christine Christiansen Hamilton hereby disclaims that portion of the Gift determined by reference to a fraction, the numerator of which is the fair market value of the Gift (before payment of debts, expenses and taxes) on April 17, 2001, less Six Million Three Hundred Fifty Thousand and No/100 Dollars ($6,350,000.00) and the denominator of which is the fair market value of the Gift (before payment of debts, expenses and taxes) on April 17, 2001 ("the Disclaimed Portion"). For purposes of this paragraph, the fair market value of the Gift (before payment of debts, expenses and taxes)on April 17, 2001, shall be the price at which the Gift (before payment of debts, expenses and taxes) would have changed hands on April 17, 2001, between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts for purposes of Chapter 11 of the [Internal Revenue] Code, as such value is finally determined for federal estate tax purposes.

<u>Id.</u> at 5. The Commissioner quibbled with this clause because he said it worked to reallocate gifts after an audit. The Commissioner invoked the standard <u>Procter</u> arguments to try to defeat the additional charitable deduction claimed by the estate; <u>viz.</u>, that the adjustment clause was a condition subsequent and that it was void as contrary to public policy. <u>Id.</u> at 16.

But we sided with the taxpayer. We held that the transfer to charity was not contingent because it remained 25 percent of the total estate in excess of $6,350,000, regardless of the

estate's ultimate valuation.  Id. at 15-16.  We also found that the public-policy arguments were undermined by Commissioner v. Tellier, 383 U.S. 687, 694 (1966), where the Supreme Court warned against invoking public-policy exceptions to the Code too freely. The "frustration [of public policy] that would be caused by allowing the contested deduction must be severe and immediate." Christiansen, 130 T.C. at 16.  In Christiansen, we not only held the clause not to be void as against public policy, but concluded instead that public policy weighed in favor of giving gifts to charities.  We also thought the Commissioner's fears that charities would be abused by low-ball estate appraisals were exaggerated.  Executors, directors of charitable foundations who owe fiduciary duties to protect charitable interests, and state attorneys general would all have some incentive to police low-ball appraisals.  Id. at 16-18.

Although Christiansen was a split decision on other issues, we were unanimous in concluding that "This case is not Procter." Id. at 17.

III. Drawing the Line

To reach a reasonable conclusion in this case, we start with two maxims of gift-tax law:  A gift is valued as of the time it is completed, and later events are off limits.  Ithaca Trust Co. v. United States, 279 U.S. 151, 155 (1929).  And gift tax is

computed at the value of what the donor gives, not what the donee receives. Id.

The Fifth Circuit held in McCord that what the taxpayer had given was a certain amount of property; and that the appraisal and subsequent translation of dollar values (what the donor gave each donee) into fractional interests in the gift (what the donees got) was a later event that a court should not consider. 461 F.3d at 627. In Christiansen, we also found that the later audit did not change what the donor had given, but instead triggered final allocation of the shares that the donees received. 130 T.C. at 15. The distinction is between a donor who gives away a fixed set of rights with uncertain value--that's Christiansen--and a donor who tries to take property back--that's Procter. The Christiansen formula was sufficiently different from the Procter formula that we held it did not raise the same policy problems.

A shorthand for this distinction is that savings clauses are void, but formula clauses are fine. But figuring out what kind of clause is involved in this case depends on understanding just what it was that Anne was giving away. She claims that she gave stock to her children equal in value to her unified credit and gave all the rest to charity. The Commissioner claims that she actually gave a particular number of shares to her children and should be taxed on the basis of their now-agreed value.

Recital C of the gift transfer documents specifies that Anne wanted to transfer "940 Class T [or Class D] Membership Units" in the aggregate; she would not transfer more or fewer regardless of the appraisal value.[18]  The gift documents specify that the trusts will take "the number of Units described in Recital C above that equals one-half the * * * applicable exclusion amount allowed by Code Section 2010(c)."  The sale documents are more succinct, stating the trusts would take "the number of Units described in Recital C above that equals a value of $4,085,190."  The plain language of the documents shows that Anne was giving gifts of an ascertainable dollar value of stock; she did not give a specific number of shares or a specific percentage interest in the PFLLC.  Much as in <u>Christiansen</u>, the number of shares given to the trusts was set by an appraisal occurring after the date of the gift.  This makes the Petter gift more like a <u>Christiansen</u> formula clause than a <u>Procter</u> savings clause.

IV.  <u>Public Policy Again</u>

Because this formula clause is not sufficiently similar to that in <u>Procter</u>, we must first ask whether to apply policy

---

[18] The contract includes a choice-of-law provision specifying use of Washington law.  Under Washington contract law, courts should not rely on contract recitals absent ambiguity in the operative clauses of the contract.  <u>Brackett v. Schafer</u>, 252 P.2d 294, 297-98 (Wash. 1953).  However, the operative provisions of this contract refer to Recital C, and would be ambiguous if we did not give consideration to the recital.  We therefore hold that the Recital C clauses in both the gift and sale documents should be given effect.

arguments at all.  As we noted in <u>Christiansen</u>, there is a general public policy in favor of encouraging gifts to charities. See <u>United States v. Benedict</u>, 338 U.S. 692, 696-97 (1950).  And the facts in this case show charities sticking up for their interests, and not just passively helping a putative donor reduce her tax bill.  The foundations here conducted arm's-length negotiations, retained their own counsel, and won changes to the transfer documents to protect their interests.  Perhaps the most important of these was their successful insistence on becoming substituted members in the PFLLC with the same voting rights as all the other members.  By ensuring that they became substituted members, rather than mere assignees, the charities made sure that the PFLLC managers owed them fiduciary duties.[19]  In <u>McCord</u>, the taxpayers built into the partnership agreement restrictions on charitable interests in the partnership (i.e., limited voting

---

[19] The Operating Agreement specifies that Managers are to "have the same fiduciary responsibilities to the Company and its Members * * * as a partner has to a partnership and its partners."  The Operating Agreement specifies the use of Washington law; under Washington law, partners owe the partnership and the partners "the duty of loyalty and the duty of care" and can be sued for breach of either.  Wash. Rev. Code Ann. secs. 25.05.165(1), 25.05.170 (West 2005).  The duty of loyalty prevents partners from coopting partnership business opportunities, transacting business with the partnership as an adverse party, and competing with the partnership.  <u>Id.</u> sec. 25.05.165(2).  The duty of care prevents a partner from engaging in grossly negligent or reckless conduct, intentional misconduct, or knowing violations of the law.  <u>Id.</u> sec. 25.05.165(3). Partners also have a duty of good faith and fair dealing.  <u>Id.</u> sec. 25.05.165(4).

rights and the right of other partners to buy out the charitable interests at any time). 120 T.C. at 362-63. In contrast, Anne's gift made the charities equal members in the PFLLC, giving the charities power to protect their interests through suits for breach of the operating agreement or breach of a manager's fiduciary duties, as well as through the right to vote on questions such as amending the operating agreement and adding new members. These features leave us confident that this gift was made in good faith and in keeping with Congress's overall policy of encouraging gifts to charities.

As in Christiansen, we find that this gift is not as susceptible to abuse as the Commissioner would have us believe. Although, unlike Christiansen, there is no executor to act as a fiduciary, the terms of this gift made the PFLLC managers themselves fiduciaries for the foundations, meaning that they could effectively police the trusts for shady dealing such as purposely low-ball appraisals leading to misallocated gifts. See Wash. Rev. Code Ann. secs. 25.05.165(1), 25.05.170 (West 2005). The directors of the Seattle Foundation and the Kitsap Community Foundation owed fiduciary duties to their organizations to make sure that the appraisal was acceptable before signing off on the gift--they also had a duty to bring a lawsuit if they later found that the appraisal was wrong. See id. sec. 24.03.127 (West 1986).

We could envision a situation in which a charity would hesitate to sue a living donor, and thus risk losing future donations or the donor's goodwill.  However, gifts are irrevocable once completed, and the charities' cause of action most likely would have been against the trusts, rather than against Anne, since the trusts held the additional shares to which the charities laid claim.

The Commissioner himself could revoke the foundations' 501(c)(3) exemptions if he found they were acting in cahoots with a tax-dodging donor.  See, e.g., sec. 503(b).  And Washington's attorney general is also charged with enforcing charities' rights.  See Wash. Rev. Code Ann. secs. 11.110.010, 11.110.120 (West 2006).  We simply don't share the Commissioner's fear, in gifts structured like this one, that taxpayers are using charities just to avoid tax.[20]  We certainly don't find that these kinds of formulas would cause severe and immediate frustration of the public policy in favor of promoting tax audits.  See Tellier, 383 U.S. at 694.

Applying the Supreme Court's admonition to the second and third policy concerns in Procter, we find a similar lack of "severe and immediate" threat to public policy.  We do not fear

---

[20] Although we don't look at subsequent events when evaluating the *bona fides* of a gift, we note favorably that at the time of trial the taxpayer was in the process of reallocating these shares in conformance with the adjusted appraisal.

that we are passing on a moot case; because of the potential sources of enforcement, we have little doubt that a judgment adjusting the value of each unit will actually trigger a reallocation of the number of units between the trusts and the foundation under the formula clause. So we are not issuing a merely declaratory judgment.

Anne also points out several other instances in which the IRS and Congress specifically allow formula clauses like this one. She argues that if Congress allows these clauses in other contexts, there can't be a general public policy against using formula provisions. For instance, the following sections specifically sanction formula clauses:

- Section 1.664-2(a)(1)(iii), Income Tax Regs., provides: "The stated dollar amount [of a payment to the recipient of a charitable remainder annuity trust] may be expressed as a fraction or a percentage of the initial net fair market value of the property irrevocably passing in trust as finally determined for Federal tax purposes." See also Rev. Rul. 72-395, sec. 5.01, 1972-2 C.B. 340, 344 (including acceptable sample formula clause).

- Revenue Procedure 64-19, 1964-1 C.B. (Part 1) 682, sanctions the use of formula clauses in marital deduction bequests.

- The Commissioner's generation-skipping transfer regulations provide that executors may "allocate the decedent's GST exemption by use of a formula." Sec. 26.2632-1(d)(1), GST Regs.

- The gift-tax qualified-disclaimer regulations include an example of an allowable fractional formula where the numerator is the "smallest amount which will allow A's estate to pass free of Federal estate tax and the

denominator is the value of the residuary estate."
Sec. 25.2518-3(d), <u>Example</u> (<u>20</u>), Gift Tax Regs.

- Finally, the gift-tax regulations' definition of qualified annuity interests says that the "fixed amount" to be given to the beneficiary can include "a fixed fraction or percentage of the initial fair market value of the property transferred to the trust, as finally determined for federal tax purposes."  Sec. 25.2702-3(b)(1)(ii)(B), Gift Tax Regs.

The Commissioner argues that the validity of these other types of formula clauses tells us nothing about the validity of the formula clause at issue here.  He says:  "The absence of an authorization of the formula clause under the instant situation is intentional, as the use of formula clauses in this situation is contrary to public policy, and frustrates enforcement of the internal revenue laws."  He seems to be saying that Congress and the Treasury know how to allow such gifts, and their failure to explicitly allow formula clauses under the Code and regulations governing gift tax means that they have implicitly banned them.  But the Commissioner does not point us to any Code section or regulation generally prohibiting formula clauses in gift transfers, or denying charitable deductions for donors who use these formula clauses in transfers to charities.  The Commissioner also fails to address the argument that Anne is actually making; the mere existence of these allowed formula clauses, which would tend to discourage audit and affect litigation outcomes the same way as Anne's formula clause, belies

the Commissioner's assertion that there is some well-established public policy against the formula transfer Anne used.

The Commissioner does distinguish all the similar clauses used elsewhere in the tax regulations as involving situations where money passing under those formulas will not escape taxation; money passing through a gift tax-free by reason of the marital deduction, for instance, will probably be taxed when the surviving spouse dies. But this is not always true. Consider section 664, governing charitable remainder trusts, in which the remaining corpus of the trust will pass to charity tax-free, as it does in the gift here. Sec. 664(c). We are therefore not persuaded that this distinction works to separate valid from invalid formula clauses.

Another difference the Commissioner cites is that the sanctioned clauses "involve the assignment of a fixed percentage or fraction of a certain value, not an open ended amount exceeding a certain dollar value." Again, we fail to see how Anne's gift to the trusts was not an "assignment of a * * * fraction of a certain value." Anne's initial gift to her children could have been expressed as a gift of the number of units equal to the lesser of 940 or the fraction with the numerator of $453,910 and the denominator of the value of a unit as finally determined for Federal tax purposes. Her gift to the foundations would then be expressed as 940 less the fraction

where the numerator is $453,910 and the denominator is the value

of a unit as finally determined for Federal tax purposes, or:

$$940 - \frac{453{,}910}{(\text{Value of a unit for tax purposes})} = \text{charitable gift}$$

The sales could be expressed in a similar mathematical formula.

In fact, only the charities could take a gift of an "open ended

amount;" the children's gifts and sales were capped at the dollar

amounts set in the transfer documents.  We are again unpersuaded.

We refuse to hold against Anne simply because she chose to

express her intended allocation of the gift in plain English,

rather than the kind of mathematical formula outlined in

regulations for other types of transfers.

In summary, Anne's transfers, when evaluated at the time she

made them, amounted to gifts of an aggregate and set number of

units, to be divided at a later date based on appraised values.

The formulas used to effect these transfers were not void as

contrary to public policy, as there was no "severe and immediate"

frustration of public policy as a result, and indeed no

overarching public policy against these types of arrangements in

the first place.

V. <u>Timing</u>

We finally face the difficult question of evaluating when Anne may claim a deduction for her gift of the additional units to the Foundations.  The amount of a charitable deduction is the fair market value of the property donated at the time of the contribution.  Sec. 1.170A-1(c), Income Tax Regs.  But the regulations also specify that, absent the delivery of an endorsed stock certificate directly to the donee or its agent, the date of a gift of stock is the date the stock is transferred on the books of the issuing corporation.  Sec. 1.170A-1(b), Income Tax Regs. We don't know when exactly the PFLLC transferred the shares on its books.

Here we have a conundrum, for the events of the gift happened as follows:

- March 22, 2002--Gift of 940 shares, split between trusts and foundations.  Letters of intent to foundations.

- March 25, 2002--Sale to trusts

- April 15, 2002--Moss Adams appraisal report

- Later in 2002--The Seattle Foundation "books" the value of the allocated shares on the basis of the Moss Adams appraisal.  The Kitsap Community Foundation's records recognize the A.Y. Petter Family Advised Fund as of December 31, 2002. In May 2003, Richard Tizzano, president of the Kitsap Community Foundation, signed Anne's Form 8283 for 2002, acknowledging receipt of PFLLC units on March 22, 2002.

- Fall 2007--Bill Sperling notified of new appraisal for PFLLC units and beginning of reallocation.

- February 2008--Tax Court trial. Reallocation ongoing.

Anne says she should be able to take the entire charitable deduction at the time of the gift, in 2002. The Commissioner says that only some of the stock went to the charities in 2002, which means Anne or her estate should take a deduction for the gift of the rest of the stock in some later year not before us.

Section 25.2511-2(a), Gift Tax Regs., provides: "The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer." Anne made a gift for which, at the time of transfer, the beneficiaries could be named but the measure of their enrichment could not yet be ascertained. The Commissioner is comfortable with this ambiguity when considering whether the gift is completed or not, and states that tax treatment should not change simply because a donee's identity becomes known at a date later than the date of the transfer. By analogy, we see no reason a donor's tax treatment should change based on the later discovery of the true measure of enrichment by each of two named parties, one of whom is a charity. In the end, we find it relevant only that the shares were transferred out of Anne's name and into the names of the intended beneficiaries, even though the initial allocation of a particular number of shares between those

beneficiaries later turned out to be incorrect and needed to be fixed.

The Commissioner bases his argument partly on <u>Procter</u>, in which a later audit acted as a condition subsequent to undo part of the gift, 142 F.2d at 827, although he does distinguish the two by saying that the reallocation provisions in Anne's transfer documents were conditions precedent. Anne disputes this, saying, "The rights Mrs. Petter transferred to the charities were fixed and determinable on the valuation date. * * * There were no conditions precedent that increased, decreased, terminated, or modified those rights." This must be true; Anne transferred a set number of shares, to be divided according to valuations set at a later date. Regardless of what might trigger a reallocation, Anne's transfer could not be undone by any subsequent events.

Washington state law confirms this--under Washington law, courts are "'"keen-sighted" to discover an intention to make an unconditional and immediate gift to a charity,'" and will find a condition precedent only when the gift document expresses a clear intention to do so. <u>Sisters of Charity of the House of Providence v. Columbia County Hosp. Distr.</u> (<u>In re Trust of Booker</u>), 682 P.2d 320, 323-24 (Wash. Ct. App. 1984) (quoting <u>Garland v. Seattle Trust Co.</u>, 173 P. 740, 744 (Wash. 1918); see also <u>Richardson v. Danson</u>, 270 P.2d 802, 805 (Wash. 1954) ("'It has been said that a condition which would ordinarily be

considered precedent may be construed as a condition subsequent where the gift is to a charity'" (quoting <u>Butts v. Seattle-First Natl. Bank</u> (<u>In re Quick's Estate</u>), 206 P.2d 489, 491 (Wash. 1949)). We are also not convinced that the reallocation was a condition precedent, based on Washington law holding that conditions precedent require the donee to perform some action before the property will become vested and because Anne never expressed an intention to create anything but an immediately vested gift. See <u>Richardson</u>, 270 P.2d at 806.

The allocation of units based on the Moss Adams appraisal, as an event occurring after the date of the gift, is outside the relevant date of the transfer, so anything that worked to change that allocation after the fact is not relevant to our current inquiry. We also don't consider dispositive the date when the charities "booked" the value of the units, or the amounts the charities booked at the time of the initial transfer, both because those actions also occurred after the transfer and because Anne had no control over the Foundations' internal accounting practices. We therefore agree with Anne that the appropriate date of the gift for tax purposes is March 22, 2002. The parties will submit calculations reflecting the amount of the gift and corresponding charitable deduction.

<u>Decision will be entered under Rule 155</u>.