T.C. Memo. 2011-133

UNITED STATES TAX COURT

JOHN H. HENDRIX AND KAROLYN M. HENDRIX, DONORS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10503-03.                    Filed June 15, 2011.

<u>John W. Porter</u>, <u>Stephanie Loomis-Price</u>, and <u>Keri D. Brown</u>,
for petitioners.

<u>Wanda M. Cohen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  By separate notices of deficiency dated
April 9, 2003, respondent determined a deficiency of
$6,939,597.53 in the Federal gift tax of each petitioner for
1999.  Petitioners petitioned the Court to redetermine those
determinations.

The parties dispute whether the defined value formula clauses at hand (formula clauses) set the fair market value of the John H. Hendrix Corp. (JHHC) stock that each petitioner transferred on December 31, 1999, to various family trusts and to a charitable foundation.  Our resolution of their dispute turns on our deciding whether the formula clauses were reached at arm's length and whether the formula clauses are void as contrary to public policy.  We decide that the formula clauses were reached at arm's length and that they are not void as contrary to public policy.  We accordingly hold that the formula clauses set the applicable value.  Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.  Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

### I.  Preface

The parties submitted to the Court stipulated facts and related exhibits.  We find those stipulated facts accordingly and incorporate those facts and exhibits herein.  Petitioners resided in Texas when their petition was filed.

### II.  Petitioners

John H. Hendrix (Mr. Hendrix) and Karolyn M. Hendrix (Ms. Hendrix) are husband and wife.  They have three adult daughters: Anne Leslie Hendrix Wood (Mrs. Wood), Kristen Lee Hendrix, and

Karmen Marie Hendrix (collectively, daughters).  On December 31, 1999, petitioners' principal asset was JHHC stock.

III.  JHHC

JHHC was incorporated on December 16, 1976, under Texas law. JHHC initially had two classes of stock, i.e., nonvoting preferred stock and voting common stock, and its only shareholders were petitioners and their daughters (directly and/or through trusts).  Petitioners owned all of the preferred stock and 51 percent of the common stock.

At the end of 1996 Stephen Dyer (Mr. Dyer), an attorney, advised petitioners that they should operate JHHC as an S corporation to eliminate any tax at the corporate level. Petitioners accepted this advice, and they caused JHHC to redeem its outstanding preferred stock to qualify for status as an S corporation.  At the suggestion of Mr. Dyer, Mr. Hendrix retained an appraisal firm, Howard Frazier Barker Elliot (Howard Frazier), to value the JHHC preferred stock incident to the redemption.

JHHC redeemed its outstanding preferred stock at the end of 1997.  Contemporaneously therewith, JHHC also exchanged its outstanding common stock for a combination of newly issued nonvoting common stock and newly issued voting common stock.  In 1998 JHHC elected to be taxed as an S corporation for Federal income tax purposes.

IV.  Petitioners' Charitable Interests

Petitioners lived in Midland, Texas, for several years and were active members of that community.  They each contributed their time and money to several charitable organizations in their community.  They also contributed money to charitable organizations outside of their community.

In or about 1999 petitioners asked Mr. Dyer for estate planning advice.  Petitioners informed Mr. Dyer that they wanted to give some of their JHHC stock to their daughters (through trusts) and to a charitable entity.  Because the stock was hard to value, Mr. Dyer suggested that petitioners use a formula clause to define the stock transfer at the time of the gift in terms of dollars rather than in percentages, while fixing for Federal gift tax purposes the value of the transfer of the stock.

In the light of petitioners' interest in making charitable gifts, Mr. Dyer advised them to establish a donor-advised fund at a nonprofit community organization.[1]  Petitioners followed this advice and chose the Greater Houston Community Foundation (Foundation) to administer their contemplated donor-advised fund. The Foundation is a tax-exempt organization that provides funds to support cultural, educational, health, and welfare programs

---

[1]A donor-advised fund is a charitable-giving account administered by a tax-exempt entity and enables donors such as petitioners to have authority over the ultimate recipient of the donation.

and that manages charitable-giving funds for families, corporations, and tax-exempt organizations. The Foundation currently manages nearly $270 million in assets in 639 funds and is under the supervision of a board of directors consisting of 34 regular board members and 8 lifetime directors. Petitioners choose the Foundation, with which they had never previously been involved, because they wanted to assist other needy parts of Texas while maintaining their local commitment.

Petitioners instructed Mr. Dyer to communicate with the Foundation on their behalf. During the summer of 1999, Mr. Dyer contacted Robert Paddock (Mr. Paddock), the Foundation's vice president of development, and informed him that petitioners wanted to make a significant charitable contribution to the Foundation of (1) $20,000 to establish a donor-advised fund and (2) JHHC nonvoting stock. Mr. Paddock reported the contemplated gift to the Foundation's executive director. Mr. Paddock also consulted the Foundation's counsel, Bill Caudill (Mr. Caudill). The Foundation's protocol on a donation of a hard-to-value asset such as nonpublicly traded stock required that Mr. Paddock consult with Mr. Caudill.

V.  The Creation of the Donor-Advised Fund at the Foundation

On August 10, 1999, Mr. Dyer sent a letter to Mr. Paddock and to Mr. Caudill, submitting a draft copy of an agreement establishing a donor-advised fund at the Foundation and

soliciting comments from them as to the draft.  Over approximately the next 3 months, the parties to the draft negotiated the terms of their agreement.  On November 9, 1999, petitioners signed an agreement establishing the donor-advised fund.  The next day, Mr. Dyer (on behalf of petitioners) sent $20,000 to the Foundation with the signed agreement.

VI.  Preliminary Steps for Stock Contribution

A.  Proposal of Agreements

On October 6, 1999, Mr. Dyer sent to the Foundation a draft of an assignment agreement and enclosed a dispute resolution and buy-sell agreement (dispute resolution and buy-sell agreement) executed by JHHC and its shareholders approximately 2 months before.  The draft indicated that petitioners would give JHHC stock to the Foundation and would transfer (part as a gift and part as a sale) JHHC stock to the trusts benefiting the daughters.  The draft indicated that a formula clause would set the portion of JHHC stock transferred to the trusts and the remaining portion given to the Foundation.  On November 19, 1999, Mr. Caudill returned the assignment agreement with an attached rider that addressed JHHC's responsibility to distribute income timely.

B.  Howard Frazier Estimate

Petitioners retained Howard Frazier in the fall of 1999 to estimate the value of the JHHC nonvoting stock.  Howard Frazier

did so on the basis of the 1997 redemption valuation of the JHHC preferred stock, and JHHC's accounts and tax records. In accordance with the estimate, petitioners decided that each of them would give $50,000 of JHHC nonvoting stock to the Foundation and would transfer $10,519,136.12 of JHHC nonvoting stock to a generation-skipping tax (GST) trust and $4,213,710.10 of JHHC nonvoting stock to an issue trust. The issue trust, in turn, benefited the daughters through other issue trusts.

C. Creation of Trusts

On or about December 29, 1999, each petitioner executed trust agreements forming a GST trust and an issue trust for the benefit of the daughters. The trustees of the trusts were Mr. Klein and Mrs. Wood (collectively, trustees). Each trust consisted of three separate and equal shares for the benefit of the daughters.

D. Partition of Community Property

On December 30, 1999, petitioners entered into an agreement that partitioned into separate property their community property interests in the JHHC nonvoting common stock. Afterwards, each petitioner owned 403,241.85 shares of JHHC nonvoting stock.

VII. Execution of Assignment Agreements and Related Agreements

On December 31, 1999, each petitioner, the trustees, and the Foundation executed an assignment agreement that irrevocably assigned 287,619.64 shares of the assignor's JHHC nonvoting stock

to the assignor's GST trust and to the Foundation. Each agreement effected the transfer pursuant to a formula under which: (1) A portion of the assigned shares having a fair market value as of the effective date equal to $10,519,136.12 was assigned to the trustees to be held in equal shares for the benefit of the daughters, and (2) any remaining portion of the assigned shares was assigned to the Foundation for the benefit of the donor-advised fund. The assignment agreements defined fair market value as the price at which those shares would change hands as of the effective date between a hypothetical willing buyer and a hypothetical willing seller, neither under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The assignment agreements required that the trusts pay proportionally any gift taxes imposed as a result of the transfer. The assignment agreements required that the trustees sign promissory notes obligating the trustees to pay $9,090,000 to each petitioner.

On the same day, a second set of assignment agreements was executed containing the same terms as the first set of assignment agreements, except that each petitioner irrevocably transferred 115,622.21 of JHHC nonvoting stock to his or her corresponding issue trust and to the Foundation, and the fair market value of the stock for the benefit of the daughters was set at $4,213,710.10. The second set of assignment agreements directed

the trustees to deliver to each petitioner a note in the amount of $3,641,233.

Under the assignment agreements, petitioners had no right or responsibility for allocating the shares among the transferees on a per-share basis. The assignment agreements left that allocation to the transferees. The assignment agreements stated that the dispute resolution and buy-sell agreement governed any dispute among the parties and any transfer of JHHC stock. The dispute resolution and buy-sell agreement required that any dispute related to the fair market value between or among JHHC, the shareholders, assignees, or any party be resolved by arbitration, if it could not be resolved by agreement.

Also on December 31, 1999, the trustees delivered the promissory (demand) notes in exchange for the shares, and petitioners executed agreements stating that the trusts and the Foundation as tenants in common would collectively own all of the assigned shares.[2] Petitioners also executed certificates of stock transferring the assigned shares to the trusts and to the Foundation as tenants in common as of December 31, 1999. Each petitioner also executed an irrevocable stock power document stating that he or she irrevocably transferred the stock to the trusts and to the Foundation as tenants in common.

---

[2]The notes were secured by the corresponding shares transferred to the trusts.

VIII.  Petitioners' Federal Gift Tax Returns

On April 12, 2000, each petitioner filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for 1999.  On each return, the corresponding petitioner claimed a charitable contribution deduction of $50,000 and a total taxable gift of $1,414,581.37.

IX.  Evaluation and Confirmation Agreements

Mr. Dyer represented the trusts in negotiating proposed confirmation agreements as to the transfers of the JHHC stock. Mr. Dyer advised the trusts to seek another appraisal of the JHHC stock as of the date of the gift.  The trustees retained Howard Frazier for this purpose.  Howard Frazier ascertained that the fair market value of the JHHC stock was $36.66 per share on December 31, 1999 (appraisal).  On April 12, 2000, Mr. Dyer sent the appraisal to the Foundation and to its counsel.

Mr. Paddock respected Howard Frazier's qualifications as an appraisal firm but his attorney advised him, and the Foundation's practice on hard-to-value assets required, that he retain another independent appraisal firm to review the appraisal.  Mr. Paddock retained White Petrov for that purpose, and White Petrov concluded on or about May 8, 2000, that the appraisal was reasonable and fair.  Approximately 1 month later, the Foundation and the trustees entered into confirmation agreements, effective as of December 31, 1999, that allocated amongst them the JHHC

nonvoting stock according to the fair market value of $36.66-per-share listed in the appraisal. Petitioners were not parties to those confirmation agreements.

X. Stipulation

Petitioners and respondent have entered into the following stipulation:

> If upon a final decision in this case it is determined that the defined value formula clauses contained in the Assignment Agreements executed by John H. Hendrix and Karolyn M. Hendrix on December 31, 1999, do not control the valuation of the shares of nonvoting common stock in John H. Hendrix Corporation transferred by John H. Hendrix and Karolyn M. Hendrix on December 31, 1999, then the fair market value of the shares transferred to each transferee shall be based on a per share value of $48.60 times the number of shares agreed to by each transferee in the Confirmation Agreements executed by the transferees.

Except for this stipulation, the only other evidence of the value of the JHHC nonvoting shares is the $36.66-per-share value ascertained by Howard Frazier and used by the trustees and the Foundation to allocate the shares amongst themselves.

OPINION

I. Overview

The parties dispute the validity of the formula clauses. Petitioners contend that the formula clauses are valid because the clauses were used to fix the transferred amount of JHHC's hard-to-value stock and the parties to those clauses conducted themselves at arm's length. Petitioners conclude that the applicable value of the stock is $36.66 per share, as reported,

and that they may deduct the $100,000 claimed as charitable contributions. Respondent argues that the formula clauses are invalid because they were not reached at arm's length and are contrary to public policy. Respondent concludes that the value of the stock is $48.60 per share and that each petitioner may deduct charitable contributions totaling $66,284.57 (i.e., $48.60 multiplied by the number of shares transferred to the Foundation).[3] We agree with petitioners that the applicable value of the stock is $36.66 per share and that each petitioner may deduct the claimed $50,000 in charitable contributions.

## II. Burden of Proof

Taxpayers normally bear the burden of proof in this Court. See Rule 142(a)(1). In certain cases, however, the burden of proof may shift to the Commissioner. See sec. 7491(a); Rule 142(a)(2). Petitioners claim this is one of those cases. Respondent does not dispute petitioners' claim that the burden has shifted to respondent with respect to the validity of the formula clauses. Respondent argues only that petitioners bear the burden if they aspire to deduct more than $66,284.57 in charitable contributions. Because petitioners aspire only to

---

[3]Respondent states repeatedly that the parties agreed that the per-share value of the stock was $48.60 and points to the stipulation quoted above to support that statement. We do not read that stipulation similarly. We read that stipulation (and the agreed-upon $48.60 value) as inapplicable to this case because, as we hold, the formula clauses "control" the valuation of the JHHC stock.

deduct $50,000 in charitable contributions, respondent's argument is irrelevant. Therefore, on the only issue for decision that remains (validity of the formula clauses), we conclude on the basis of the record that the burden of proof is on respondent.

III. Statutory and Regulatory Law

Sections 2501 and 2512 govern the valuation of the JHHC stock transferred to the trusts and to the Foundation. Section 2501 imposes a tax on an individual's transfer of property by gift during the calendar year. Section 2512(a) provides that the amount of the gift is the value of the property on the date of the gift. Section 2512(b) provides that where property is transferred for less than an adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is a gift and is included in computing the amount of gifts made during the year.

IV. Succession of McCord

A. Discussion

This case is appealable to the Court of Appeals for the Fifth Circuit, and we follow precedent of that court that is squarely on point. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Petitioners argue that Succession of McCord v. Commissioner, 461 F.3d 614 (5th Cir. 2006), revg. 120 T.C. 358 (2003), is such precedent. We agree. As discussed below, Succession of McCord is dispositive of this

case except to the extent that respondent argues that: (1) The formula clauses are not the result of an arm's-length transaction or (2) the formula clauses are void as contrary to public policy.

Succession of McCord is factually similar to this case. There, Charles and Mary McCord (collectively, McCords) transferred their interest in McCord Interests, Ltd., L.L.P. (MIL), to nonexempt and exempt donees according to a formula clause nearly identical to the one here. MIL was a limited liability partnership formed by the McCords, their sons, and the sons' limited liability partnership.

On January 12, 1996, the McCords executed an assignment agreement that used a formula clause to irrevocably dispose of their class B limited partnership interest to GST trusts, to their sons, to the Community Foundation of Texas, Inc. (CFT), and to the Shreveport Symphony, Inc. (Symphony).[4] The formula clause stated that: (1) GST trusts would receive interests in MIL with a fair market value equal to the dollar amount of the McCords' net remaining generation-skipping tax exemption, reduced by the dollar value of any transfer tax obligation assumed by the trusts; (2) the sons would receive interests in MIL with a fair market value of $6,910,932.52, reduced by the dollar value of the interests given to the GST trusts and any transfer tax obligation

---

[4]The McCords had previously donated their entire class A limited partnership interest in MIL to another charitable foundation.

assumed by the sons; (3) the Symphony would receive an interest in MIL with a fair market value of $134,000; and (4) CFT would receive any remaining interest.  The assignment agreement defined fair market value according to the willing buyer/wiling seller test specified in the regulations and required the donees to apply that standard to ascertain the fair market value of the class B limited partnership interests.  The assignment agreements did not specify any method that the donees had to employ to equate their dollar amount of gifts to percentages of interest in MIL, and the parties to the transaction lacked any agreement, either oral or expressed, on any such method.  See id. at 618-619.

Howard Frazier was hired to value a 1-percent limited partnership interest in MIL, and on February 28, 1996, the sons and their trusts presented CFT and the Symphony with a Howard Frazier appraisal stating that the fair market value of a 1-percent limited partnership interest was $89,505 on the date of the gift.  CFT exercised its right to retain outside counsel to review the appraisal independently.  Although CFT did not retain an independent appraiser, the CFT officers and their outside counsel expressed confidence in Howard Frazier's methodology and service and accepted its valuation.  In March 1996 all the donees executed a confirmation agreement allocating the partnership

interests to the parties according to the value stated in the appraisal.

By separate notices of deficiency, the Commissioner determined a deficiency in the Federal gift tax of each of the McCords on the basis of their understatement of the value of the limited partnership interests. The McCords petitioned this Court, and we decided that they had inaccurately determined the fair market value of the 1-percent limited partnership interest. See McCord v. Commissioner, 120 T.C. 358 (2003). The Court of Appeals for the Fifth Circuit disagreed, holding that the fair market value of the 1-percent limited partnership interest was as determined by the Howard Frazier report and used by the McCords to prepare their gift tax returns. See Succession of McCord v. Commissioner, supra at 628. The court noted that the Commissioner had relied in this Court on the doctrine of violation of public policy but had waived that doctrine on appeal. See id. at 623.

B. Applicability to This Case

Respondent states that Succession of McCord v. Commissioner, supra, is not controlling precedent because the Court of Appeals for the Fifth Circuit did not consider specific arguments that respondent makes here. We agree that Succession of McCord does not control this case to the extent that respondent's current arguments implicate issues not decided by the Court of Appeals

for the Fifth Circuit in Succession of McCord.  Respondent makes two such arguments in this case.  First, respondent argues as a point of fact that the formula clauses are invalid because they were not reached at arm's length.  Second, respondent argues as a point of law that the formula clauses are void as contrary to public policy.  We proceed to address those two arguments. Succession of McCord disposes of all other arguments.

V.  Arm's-Length Transaction

Generally, a taxpayer may structure a transaction in a manner that minimizes or avoids taxes by any means the laws allow.  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  Courts, however, may disregard the form of a transaction in favor of its substance where there is collusion, an understanding, a side deal, or another indicium that the transaction was not at arm's length.  The disregard of a transaction for lack of substance, however, cannot be based on mere suspicion and speculation arising from the fact that a taxpayer engaged in estate planning. See Strangi v. Commissioner, 293 F.3d 279, 282 (5th Cir. 2002), affg. in part and revg. in part T.C. Memo. 2003-145; Hall v. Commissioner, 92 T.C. 312, 335 (1989).  Nor do we strictly scrutinize a transaction, or presume that a transfer is a gift, where, as here, the transaction involves a third party without familial or financial ties to the transferee's family group.  Cf. Kimbell v. United States, 371 F.3d 257, 263 (5th Cir. 2004)

(applying the strict scrutiny standard and imposing a presumption that the transferred property is a gift when a mother transferred a large portion of her estate to three entities her son owned); Harwood v. Commissioner, 82 T.C. 239, 258 (1984) (applying the strict scrutiny standard and raising the presumption that the property transferred among a family was a gift where a mother transferred her partnership interest to her sons), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). Instead, we must find credible evidence that the parties colluded or had side deals or that the form of the transactions otherwise differed from the substance. We find no such credible evidence here.

Respondent argues that the formula clauses failed to be reached at arm's length because petitioners and their daughters (or their trusts) were close and lacked adverse interests, the daughters benefited from petitioners' estate plan, and the clauses were not thoroughly negotiated. We disagree. The mere facts that petitioners and their daughters were "close" and that petitioners' estate plan was beneficial to the daughters does not necessarily mean that the formula clauses failed to be reached at arm's length. Nor is a finding of negotiation or adverse interests an essential element of an arm's-length transaction, see Kimbell v. United States, supra at 263; Huber v. Commissioner, T.C. Memo. 2006-96; Estate of Stone v. Commissioner, T.C. Memo. 2003-309, although we find nothing in

the record to persuade us either that the formula clauses were not subject to negotiation or that petitioners and the daughters' trusts lacked adverse interests. We also note economic and business risk assumed by the daughters' trusts as buyers of the stock (i.e., the daughters' trusts could receive less stock for their payment if the JHHC stock was overvalued) placed them at odds with petitioners and the Foundation.

Respondent asks the Court to find collusion between petitioners and the Foundation. We decline to do so. Petitioners' creation of the donor-advised fund at the Foundation did not diverge from their usual course of donation, because they could still request the Foundation to provide a grant to any of their usual donees. The Foundation, in turn, accepted various potential risks incident to its receipt of petitioners' gift of the JHHC stock, including a loss of the Foundation's tax-exempt status if it failed to exercise due diligence as to the gift. The Foundation, a manager of nearly $270 million in assets, exercised its bargaining power when its counsel insisted that petitioners pay local taxes and penalties as well as Federal and State taxes and penalties if JHHC failed to distribute sufficient income to pay those taxes. The Foundation also was represented by counsel independent of petitioners or their counsel, and the Foundation conducted an independent appraisal through White Petrov. We also note that the Foundation had a fiduciary

obligation under Federal and State law to ensure that it received the number of shares it was entitled to receive under the formula clauses. See sec. 501(c)(3); Tex. Rev. Civ. Stat. Ann. art. 1396-2.28 (West 1997).

VI.  Public Policy

Respondent argues that the formula clauses are void as contrary to public policy. We disagree. While the Court can disallow a deduction on public policy grounds if allowing such a deduction would severely and immediately frustrate sharply defined national or State policies proscribing certain conduct, see Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30, 35 (1958), the formula clauses do not immediately and severely frustrate any national or State policy. To the contrary, the fundamental public policy here is one of encouraging gifts to charity, and the formula clauses support that policy.

Respondent relies on Commissioner v. Procter, 142 F.2d 824 (4th Cir. 1944), and its progeny, for a contrary result. There, a taxpayer assigned his interest in two trusts subject to the life estate of his mother. The taxpayer instructed the trustees that, upon his mother's death, certain amounts of the corpora should be paid to him during his life, and the remaining corpora should be delivered to his children or their representatives at his death. The amounts of the corpora paid to the taxpayer were tied to the amounts due on loans from his mother secured by his

interests in the two trusts. The trust indenture stated as a saving provision that if it was ultimately determined that any part of the transfer in trust was subject to gift tax, then the property subject to the tax was not to be included in the conveyance to the trust and would remain property of the taxpayer.

The Court of Appeals for the Fourth Circuit held that this saving clause was void as contrary to public policy. Such was so, the court stated, for three reasons. First, the provision discouraged the collection of the tax because any attempt to collect the tax would defeat the gift. See id. at 827. Second, the effect of the condition was to obstruct the administration of justice by requiring a court to pass upon a moot case. See id. Third, the provision would reduce a Federal court's final judgment to a declaratory judgment. See id. Since Commissioner v. Procter, supra, Federal courts have relied upon that case to invalidate other saving provisions. See, e.g., Ward v. Commissioner, 87 T.C. 78 (1986) (invalidating saving clause that provided for a retroactive adjustment of stock to escape any imposition of gift tax).

The present case is distinguishable from Procter and its progeny. Here, unlike there, the formula clauses impose no condition subsequent that would defeat the transfer. Moreover, as stated above, the formula clauses further the fundamental

public policy of encouraging gifts to charity.  Recently, in Estate of Christiansen v. Commissioner, 130 T.C. 1, 16-18 (2008), affd. 586 F.3d 1061 (8th Cir. 2009), we held that an essentially similar dollar-value formula disclaimer was not contrary to public policy.  We know of no legitimate reason to distinguish the formula clauses from that disclaimer, and we decline to do so.  We hold that the formula clauses are not void as contrary to public policy.

VII.  Conclusion

We hold consistently with Succession of McCord v. Commissioner, 461 F.3d 614 (5th Cir. 2006), that the formula clauses control the transfers of the JHHC stock to the trusts and the Foundation on December 31, 1999.  Given this holding, no additional value passed to the Foundation as of December 31, 1999, and petitioners are entitled to deduct the $100,000 in charitable contributions claimed.  All arguments for contrary holdings have been considered and, to the extent not discussed above, we find those arguments to be without merit.  Accordingly,

Decision will be entered for petitioners.