# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 3, 2021

Lyle W. Cayce
Clerk

No. 20-61068

Mary P. Nelson; James C. Nelson,

*Petitioners—Appellants*,

*versus*

Commissioner of Internal Revenue,

*Respondent—Appellee*.

Appeal from a Decision of the
United States Tax Court
Tax Court Nos. 27321-13 and 27313-13

Before King, Smith, and Haynes, *Circuit Judges*.
King, *Circuit Judge*:

Mary P. Nelson and James C. Nelson appeal from the Tax Court's denial of their petition for a redetermination of a deficiency of gift tax issued by the Commissioner of Internal Revenue for the tax years 2008 and 2009. For the following reasons, we AFFIRM.

## I.   FACTS & PROCEDURAL HISTORY

Mary P. Nelson ("Mary Pat") and James Nelson, a married couple with four daughters, sought to plan their estate. To that end, they formed a limited partnership, Longspar Partners, Ltd. ("Longspar"), in 2008. Mary

No. 20-61068

Pat and James named themselves general partners of Longspar, each with a 0.5% general partner interest. The limited partners were Mary Pat and various trusts and accounts that had been established for the Nelsons' daughters. The majority of Longspar's assets were shares of stock in Warren Equipment Company, a holding company for several businesses founded by Mary Pat's father.

As part of their estate plan, Mary Pat and James also formed a trust in 2008. Mary Pat was the settlor, James was the trustee, and James and the Nelsons' daughters were the beneficiaries. In late 2008 and early 2009, Mary Pat transferred her limited partner interests in Longspar to the trust in two separate transactions—a gift and then a sale. The transfer agreement for the gift stated that:

> [Mary Pat] desires to make a gift and to assign to [the trust] her right, title, and interest in a limited partner interest having a fair market value of TWO MILLION NINETY-SIX THOUSAND AND NO/100THS DOLLARS ($2,096,000.00) as of December 31, 2008 (the "Limited Partner Interest"), as determined by a qualified appraiser within ninety (90) days of the effective date of this Assignment.

The transfer agreement for the sale used largely similar language, transferring "a limited partner interest having a fair market value of . . . $20,000,000" and providing for a determination by appraisal within 180 days.

As called for by the transfer documents, Mary Pat and James (through their attorney) contracted with an accountant to appraise the value of a 1% limited partnership interest in Longspar. On September 1, 2009 (outside of the time period required by each transfer document), the accountant provided a report valuing a 1% limited partner interest in Longspar at $341,000. The Nelsons' attorney then used the fair market value as

2

determined by the accountant to convert the dollar values in the transfer agreements to percentages of limited partner interests—6.14% for the gift and 58.65% for the sale. Those percentages were then listed on Longspar's records, included in Longspar's amended partnership agreement, and listed on the Nelsons' Form 709 gift tax returns.[1]

The IRS then audited the Nelsons' tax returns. In anticipation of a settlement that would have included a higher valuation of the Longspar interests, the Nelsons amended the relevant records and reallocated previous distributions to match that valuation. However, when no settlement was actually reached, the Commissioner issued Notices of Deficiency listing $611,708 in gift tax owed for 2008 and $6,123,168 for 2009. The Nelsons challenged the deficiencies in the Tax Court. They argued that their initial valuation was correct and, even if it was not, that they had sought to transfer specific dollar amounts through a formula clause and that the amount of interests transferred should be reallocated should the valuation change.

The Tax Court rejected both arguments. It first found that the proper valuation of a 1% limited partner interest in Longspar was $411,235, not $341,000. The court also found that the language in the transfer documents was not a valid formula clause that could support reallocation. Instead, Mary Pat had transferred the percentage of interests that the appraiser had determined to have the values stated in the transfer documents; those percentages were fixed once the appraisal was completed. Accordingly, the Tax Court held that Mary Pat and James each owed $87,942 in gift tax for 2008 and $920,340 in gift tax for 2009. The Nelsons timely appeal the

---

[1] Consistent with its treatment as a sale, the Nelsons did not list the second transfer on their gift tax return.

court's finding that the transfers consisted of percentage interests, rather than fixed dollar amounts.

## II.   STANDARD OF REVIEW

"An appellate court reviews a trial court's conclusions of law *de novo* and draws its own conclusions in place of those of the trial court." *Succession of McCord v. Comm'r*, 461 F.3d 614, 623 (5th Cir. 2006). The same standard of review also applies to "a question of fact, such as valuation" that "requires legal conclusions" and "determination of the nature of the property rights transferred" that are "question[s] of state law." *Id.*

## III.   DISCUSSION

We are asked to determine whether the two transfer documents transferred specific percentages of limited partner interests or the amount of interests that equal fixed dollar amounts. The latter theory would allow the percentage of interests transferred to be reallocated should the valuation change, as was the case here. The former would render the percentage of interests transferred fixed even in the face of a changed valuation.

When determining the amount of gift tax, if any, that applies to a transfer, the nature of that transfer is ascertained by looking to the transfer document and its language, rather than subsequent events. *Succession of McCord*, 461 F.3d at 626-27; *Est. of Petter v. Comm'r*, T.C. Memo. 2009-280, 2009 Tax Ct. Memo LEXIS 285, at *36 (citing *Ithaca Tr. Co. v. United States*, 279 U.S. 151, 155 (1929)), *aff'd*, 653 F.3d 1012 (9th Cir. 2011). The language that the Nelsons used in the gift instrument stated that they were transferring:

> [Mary Pat's] right, title, and interest in a limited partner interest having a fair market value of TWO MILLION NINETY-SIX THOUSAND AND NO/100THS DOLLARS

> ($2,096,000.00) as of December 31, 2008 (the "Limited Partner Interest"), *as determined by a qualified appraiser within ninety (90) days of the effective date of this Assignment.*

This additional (i.e., emphasized) language expressly qualifies the definition of "fair market value" for the purposes of determining the interests transferred. By its plain meaning, the language of this gift document and the nearly identical sales document transfers those interests that the qualified appraiser determined to have the stated fair market value—no more and no less.

The specific qualification added by the Nelsons separates their agreement from the formula clauses considered in other cases. Most formula-clause cases featured transfer instruments that defined the interests transferred as the fair market value as determined for federal-gift or estate-tax purposes. *See Est. of Petter v. Comm'r*, 653 F.3d 1012, 1015-16 (9th Cir. 2011); *Est. of Christiansen v. Comm'r*, 586 F.3d 1061, 1062 (8th Cir. 2009); *Wandry v. Comm'r*, T.C. Memo. 2012-88, 2012 Tax Ct. Memo LEXIS 89, at *4-5, *nonacq.*, 2012-46 I.R.B. 543 (Nov. 13, 2012). Those that did not defined fair market value through reference to the "willing-buyer/willing-seller" test that is used to define fair market value in the relevant Treasury regulation. *Succession of McCord*, 461 F.3d at 619 (citing 26 C.F.R. § 25.2512-1 (2005)); *Hendrix v. Comm'r*, T.C. Memo. 2011-133, 2011 Tax Ct. Memo LEXIS 130, at *8. The Nelsons defined their transfer differently; they qualified it as the fair market value that was determined by the appraiser. Once the appraiser had determined the fair market value of a 1% limited partner interest in Longspar, and the stated dollar values were converted to percentages based on that appraisal, those percentages were locked, and remained so even after the valuation changed.

Additionally, this case is not like *Succession of McCord*, where the definition of fair market value was unqualified. *See McCord v. Comm'r*, 120 T.C. 358, 419 (2003) (Foley, J., concurring in part and dissenting in part), *rev'd sub nom. Succession of McCord*, 461 F.3d at 614.[2] Instead, the transfer agreement specifically qualified fair market value by reference to the appraiser, rather than to a final determination or to gift tax principles. Following the Nelsons' reading of the clause would give effect only to the first part (referencing fair market value) and not the second (referencing a qualified appraiser). Such a reading does not comport with the plain meaning of the language used.

Moreover, the transfer documents in every other formula-clause case contained crucial language that the Nelsons' instruments lacked: specific language describing what should happen to any additional shares that were transferred should the valuation be successfully challenged. Some cases provided for excess interests to go to charity. *See Est. of Petter*, 653 F.3d at 1016; *Succession of McCord*, 461 F.3d at 619; *Hendrix*, 2011 Tax Ct. Memo. LEXIS 130, at *8. Another case involved an instrument that stated that "the number of gifted Units shall be adjusted . . . so that the value of the number of Units gifted to each person equals the amount set forth above." *Wandry*, 2012 Tax Ct. Memo LEXIS 89, at *6. The Nelsons' agreements contain no such language. Nothing in the agreements compels the trust to return excess units, or do anything with excess units, should the valuation change. The fact that the trust did return excess units is irrelevant; that fact is the type of "subsequent occurrence[]" that this court has said was "off limits" when determining the value of a gift. *Succession of McCord*, 461 F.3d at 626.

---

[2] While this court overturned the Tax Court's decision in *McCord*, we extensively cited Judge Foley's partial concurrence and dissent with approval. *See Succession of McCord*, 461 F.3d at 627-28.

As the government well-analogized, if a farmer agrees to sell the number of cows worth $1,000 as determined by an appraiser, and the appraiser determines that five cows equals that stated value, then the sale is for five cows. If a later appraisal determined that each cow was worth more, and that two extra cows had been included in the sale, nothing in the agreement would allow the farmer to take the cows back. The parties would be held to what they agreed—a transfer of the number of cows determined by the appraiser to equal $1,000. So too here. No language in the transfer agreements allows the Nelsons to reopen their previously closed transaction and reallocate the limited partner interests based on a change in valuation.

While the formula-clause cases might give the appearance of reopening a transaction in just such a fashion, that is not the case. A gift is considered complete, and thus subject to the gift tax, when "the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or the benefit of another." 26 C.F.R. § 25.2511-2(b) (2021). For tax purposes, the "value . . . at the date of the gift shall be considered the amount of the gift." 26 U.S.C § 2512(a). With a formula clause, the transaction is still closed even if a reallocation occurs. That reallocation simply works to ensure that a specified recipient "receive[s] those units [he or she was] already entitled to receive." *Est. of Petter*, 653 F.3d at 1019. Similarly, the value of the gift existed and could be determined at the time of the transfer. "The number of . . . units" transferred is "capable of mathematical determination from the outset, once the fair market value [is] known." *Id.* The reallocation clauses thus allow for the proper number of units to be transferred based on the final, correct determination of valuation.

The Nelsons did not include such a clause. Instead, the trust has already received everything it was entitled to—the number of units matching the stated value as determined by a qualified appraiser. Both parties agree

with the Tax Court's conclusion that the gift was complete, and that Mary Pat parted with dominion and control, on the date listed in each transfer agreement. On those dates, Mary Pat irrevocably transferred the number of units the appraiser determined equaled the stated values. No clause in the transfer documents calls for a reallocation to ensure the trust received a different amount of interests if the final, proper valuation was different than the appraiser's valuation. The percentage of interests was transferred on the listed dates, even if those percentages were indefinite until the appraisal was completed. *Cf. Robinette v. Helvering*, 318 U.S. 184, 187 (1943) (holding that a gift was complete even in the face of "indefiniteness of the eventual recipient"). The gift tax is assessed as of the date of the transfer and on the value of those percentages, whatever that value may be. Simply put, while the Nelsons may have been attempting to draft a formula clause, they did not do so.

The interpretation of the transfer documents is not changed by looking to any objective facts outside of the language the Nelsons used. First and foremost, under Texas law, "extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or 'create ambiguity.' " *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757 (Tex. 2018) (quoting *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 688 (Tex. 2017)). "If a written contract is so worded that it can be given a definite or certain legal meaning when so considered and as applied to the matter in dispute, then it is not ambiguous." *Id.* at 765.

Here, the transfer agreements are not ambiguous; the meaning of the language prescribing that an appraiser will determine the percentage of interests to be transferred is definite and certain. "An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract[;]" "for an ambiguity to exist, both interpretations must be *reasonable*." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940

No. 20-61068

S.W.2d 587, 589 (Tex. 1996). Given the clarity of the language of the contracts as written, the Nelsons' interpretation is not reasonable as a matter of law; as stated earlier, that interpretation would read out the reference to the appraisal in its entirety. "Surrounding facts and circumstances can inform the meaning of the language but cannot be used to augment, alter, or contradict the terms of an unambiguous contract." *URI*, 543 S.W.3d at 758 (citation omitted). The Nelsons' reading, based on their subjective intent, would go beyond elucidating contractual language to changing and overriding it. Texas contract law does not allow for that.

Even if the contracts are ambiguous, there are no *objective* facts or circumstances surrounding the transfer that counsel a different result. Under federal gift tax law, "the application of the tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor." 26 C.F.R. § 25.2511-1(g)(1) (2021). Texas contract law commands the same. *URI*, 543 S.W.3d at 767 ("[T]he parol evidence rule prohibits extrinsic evidence of *subjective* intent that alters a contract's terms. . . ."). The evidence the Nelsons point to all concerns their subjective intent; we cannot look to what the Nelsons had in their minds when drafting the contracts. Rather than subjective intent, it is "objective manifestations of intent [that] control, not 'what one side or the other alleges they intended to say but did not.' " *Id.* at 763-64 (citation omitted) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). Objective considerations include the "surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

The only objective circumstance the Nelsons can point to in support of their reading is the setting of the transfer, as part of the Nelsons' estate planning that aimed to protect their assets while also avoiding as much tax

liability as possible. *See URI*, 543 S.W.3d at 768 ("Setting can be critical to understanding contract language, as we found in cases involving the lawyer-client relationship and construction of an arbitration agreement." (citations omitted)); *Hous. Expl. Co.*, 352 S.W.3d at 469 (stating that objective circumstances include "the commercial or other setting in which the contract was negotiated" (quoting 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999))). Consideration of the estate-plan context still hews too closely to consideration of the Nelsons' subjective intent to alter the understanding of the contractual language. For an arbitration agreement or a contract between a lawyer and a client, one can tell the setting from fully objective facts—normally, by looking at the plain text of the agreement. For the Nelsons' transfers, however, consideration of the estate-plan setting still requires determining what was in their minds at the time of the transfers. One would still need to determine that, in transferring assets from Mary Pat to the trust, the Nelsons had the *subjective* intent of minimizing their tax liability. While that might be fairly obvious, it still requires consideration of subjective intent, rather than objective facts. This goes beyond the scope of the parol evidence rule under Texas law.

Further, the fact that the language *differs* from other, similar contracts in the same setting is significant. This is not a case where we would be reading the contracts in line with numerous other, similar contracts that are regular parts of a given industry or setting, such as arbitration. To support the Nelsons' reading, we would be required to disregard significant differences between these contracts and the transfer documents used in similar cases. That would be an improper use of facts and circumstances surrounding the contract. *Cf. Hous. Expl. Co.*, 352 S.W.3d at 469-72 (holding that deletions from a form contract should be considered when judging the parties' intent for the agreement). The fact that the transfers involved a family trust and

family assets and were made in the setting of estate planning should not be used to interpret the Nelsons' intent.

The Nelsons also point to the fact that the appraisal was not completed within the allotted times specified in the agreements. That fact does not change the result. The delay in the appraisal does not demonstrate anything about the nature of the transfers; it only means that the trust would potentially have had a claim against Mary Pat (since the language of the agreement was violated) and that both the trust and Mary Pat might have had a claim against the appraiser (depending on the nature of their agreement with him). However, the transfers were still completed on the dates listed in the transfer documents and in accordance with the language used. And the lack of concern demonstrated for the tardy appraisal is yet another indicium of subjective intent which similarly cannot be considered under Texas's parol evidence rule.

The transfer documents clearly and unambiguously state that Mary Pat was gifting and selling the percentage of limited partner interests that an appraiser determined to have a fair market value equal to a stated dollar amount. The transfer agreements must be interpreted as written. The Nelsons therefore transferred what the plain language of their transfer instruments stated—$2,096,000 and $20,000,000 of limited partner interests in Longspar as determined by a qualified appraiser to be 6.14% and 58.65% of such interests. Thus, when the Tax Court found the fair market values of those percentages to actually be $2,524,983 and $24,118,933, respectively, the Nelsons were left with a gift tax deficiency.[3] Therefore, the

---

[3] The gift tax deficiency on the sale results from the excess value of the interests transferred that were not the subject of due consideration from the $20,000,000 promissory note issued by the trust; gifts include "sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by

No. 20-61068

Tax Court was correct in determining that Mary Pat and James Nelson each owes $87,942 in gift tax for 2008 and $920,340 in gift tax for 2009.

## IV.    CONCLUSION

For the foregoing reasons, the judgment of the Tax Court is AFFIRMED.

---

the donor exceeds the value . . . of the consideration given therefor." 26 C.F.R. § 25.2512-8 (2021).